AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Origina

**FILED**
CLERK, U.S. DISTRICT COURT

1/13/2023

CENTRAL DISTRICT OF CALIFORNIA
BY /Felicia Munoz DEPUTY

**L O D G E D**
CLERK, U.S. DISTRICT COURT

1/13/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

CAROLINE JOANNE HERRLING,
 aka Carrie Phenix,
 aka Caroline Gardiner,

Defendant

Case No.  2:23-mj-00165-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 1028A, 21 U.S.C. §§ 841(a)(1), (b)(1)(C) | Wire Fraud Conspiracy, Aggravated Identity Theft, Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Mark O'Donnell*
_____
*Complainant's signature*

Mark O'Donnell, Detective
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  1/13/23

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Charles Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2020, and continuing through at least January 12, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant CAROLINE JOANNE HERRLING, aka "Carrie Phenix," aka "Caroline Gardiner" ("Defendant"), and others, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:   Defendant and her co-conspirators would steal the identities of elderly and vulnerable victims who owned real property.  Defendant and her co-conspirators would forge power of attorney forms so that defendant could pretend to act on behalf of her victims when stealing their real estate.  Defendant and her co-conspirators would dispose of the bodies of some of defendant's victims in order to make it appear that they were still alive and supported the actions she wanted to take with their properties.  Defendant would also attempt to hide the death of one of her victims by hiring persons to impersonate him, and to falsely claim to have seen him alive.  Defendant and her co-conspirators used interstate wires to defraud their victims throughout this conspiracy.

Count Two, 18 U.S.C. § 1028A

Beginning in or before 2020, and continuing through at least January 12, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant CAROLINE JOANNE HERRLING, aka "Carrie Phenix," aka "Caroline Gardiner," knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

Count Three, 21 U.S.C. §§ 841(a)(1), (b)(1)(C)

Beginning on an unknown date, and continuing through at least January 12, 2023, in Los Angeles County, within the Central District of California, and elsewhere, defendant CAROLINE JOANNE HERRLING, aka "Carrie Phenix," aka "Caroline Gardiner," knowingly and intentionally possessed with intent to distribute a mixture or substance containing a detectable amount of heroin and psilocybin, schedule I controlled substances, and methamphetamine, a schedule II controlled substance.

**AFFIDAVIT**

I, Detective Mark O'Donnell, being duly sworn, hereby depose and
state as follows:

## I. TRAINING AND EXPERIENCE

1.    I am a sworn police officer for the Los Angeles Police
Department (LAPD), currently assigned to Operations-Valley
Bureau Homicide as a detective supervisor.  I have been employed
by the LAPD since June 1996.  I have been a detective since
2005.  In my current assignment, I am tasked with supervising a
team of detectives, who investigate all manner of deaths within
the Bureau, including murder.  Prior to my assignment as a
supervisor, I was a homicide investigator for thirteen years.  I
have participated in the investigations of hundreds of
homicides, which have resulted in the arrests and convictions of
dozens of individuals for murder, manslaughter, and kidnaping.
These investigations often revealed various motives, including
financial gain. I have authored countless search warrants to
financial institutions to show the flow of money to various co-
conspirators.  I have worked with experienced detectives from
the LAPD Forgery and Financial Crimes Sections, who have
assisted me in understanding complex financial crimes.  Prior to
this assignment, I have been assigned to investigate robberies,

burglaries, thefts, and forgeries.

2.   I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II. SUMMARY AND PURPOSE OF AFFIDAVIT: COMPLAINT

3.   This affidavit is made in support of a complaint against CAROLINE HERRLING, aka Caroline Phenix, aka Carrie Phoenix ("HERRLING") for violations of 18 U.S.C. §§ 1028A, 1343, 1349 (conspiracy to commit wire fraud, aggravated identity theft) and 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) following her probable cause arrest on January 12, 2023.

A. Summary of Investigation

4.   In October 2021, the Los Angeles Police Department

initiated an investigation in which a man named Charles Wilding was reported missing.  I became involved because he appears to be dead and an unidentified caller stated his death may have been as a result of foul play.  The investigation led to a woman named Carrie or CAROLINE HERRLING ("HERRLING"), a/k/a Carrie PHENIX.  HERRLING has identified herself as a close family friend of the Wildings, and the trustee of the Wilding Family Trust, allegedly created by June Wilding, Charles' mother (June died in 2017), but which is actually a forgery.  HERRLING was interviewed by uniformed Los Angeles Police Officers at the Wilding family residence, 3860 Kingswood Road, Sherman Oaks, CA. At the time, she claimed that Charles Wilding had moved temporarily to the City Carpinteria; in fact he appears to be dead, but his body has not been found.  Subsequent to this missing person investigation, I obtained several court filings made by HERRLING in reference to her appointment as the trustee and beneficiary of the Wilding Family Trust.  Many of these documents have been falsified and/or forged.

5.   I also learned that Charles Wilding is listed as the executor and beneficiary to the Jackie Shields Lowenstein Will. This Will was purportedly "discovered" by HERRLING in a safe deposit box rented by June Wilding.  Like the "Wilding Family Trust," the Lowenstein Will is a forgery.  Based on the forged Lowenstein Will, Charles Wilding (whose assets HERRLING controls

- 3 -

through the forged Wilding Family Trust) was to inherit over $1.7 Million, mainly from the sale of Lowenstein's Property. Court filings by HERRLING in relation to the authenticity of Lowenstein Will are falsified and/or forged. Because Wilding appears to be dead, and HERRLING controls his assets through the Wilding Family Trust, HERRLING effectively took control, too, of the Lowenstein Property by listing him as the executor and beneficiary to the Lowenstein Will, which was forged.

6.   In addition to stealing the estates of the deceased, HERRLING has also taken over real estate of the living through identity theft. Using forged documents, HERRLING sold the property of Robert Tascon for almost $1.5 million. HERRLING then took funds from her fraud to purchase HERRLING'S WOODLAKE RESIDENCE. (The buyer of Tascon's property is currently in a civil dispute with Tascon's estate. Tascon died of a gunshot wound to the head on September 11, 2022, which the police determined to be a suicide).

7.   On January 12, 2023, I and other law enforcement officers executed federal search warrants on the current and former residences HERRLING and found among other things: a valid passport of a person who resembles HERRLING, numerous loaded guns, including one in HERRLING's purse, authentic looking federal law enforcement and Beverly Hills Police badges, various kinds of drugs, including for distribution, blank

- 4 -

prescription forms, stolen identities, counterfeit identifications, and documents showing evidence of fraud and forgeries, including notes where HERRLING was practicing signing the names of victims, among many other items of evidence.  We arrested HERRLING on probable cause.

III. **Probable Cause Statement**

8.    In June 2022, I contacted Inspector Lyndon Versoza[1] of the United States Postal Inspection Service, seeking assistance in the Wilding Missing Person case, where it is believed that HERRLING has defrauded and continues to try to defraud the Wilding estate and likely is involved in the other real estate fraud and wire fraud schemes involving the Lowenstein and Tascon estate.  From my investigation I learned:

a.    Charles Howard Wilding, Jr. was born in 1951. Wilding lived his entire life at 3860 Kingswood Road in Sherman Oaks, CA in the City of Los Angeles.  Wilding's father, Charles Wilding, Sr. died in the late 1960s. Wilding lived with his mother, June Wilding, until she died in 2017.  He was an only child.  Residents on Kingswood Road described the Wildings as reclusive.  After June's death, Wilding was rarely seen outside

---

[1] Inspector Versoza is designated as a Subject Matter Expert in Money Laundering for the US Postal Inspection Service.  He has about 20 years of federal law enforcement experience.

the home and did not have visitors.  Occasionally, Wilding was seen walking to and from a local market and would exchange pleasantries with neighbors.

   A. Anonymous call regarding Charles Wilding

   9.   On October 6, 2021, I received an anonymous phone call from an individual, who did not wish to provide their name or contact information.  The caller stated that a male named Charles Wilding was possibly deceased, and his death was not being reported because unidentified individuals are utilizing his identity for financial gain.  The caller did not identify these individuals but described them as drug users and dangerous people.  The caller provided an address of 3860 Kingswood Road in Sherman Oaks, where Wilding lived.  The caller alluded that Wilding's death may have been as a result of foul play, without providing additional details. The caller disconnected the line.

   10.   I queried Los Angeles Police Department resources and determined that Charles Wilding was documented as the victim on an incident report, dated December 21, 2020, bearing LAPD DR No. 20-0918878.  The report was completed after a radio call was generated by a concerned neighbor.  The neighbor stated that Wilding had not been seen in three months and is known to be a recluse, without family or friends.

   11.   Police Officers Abiva, Serial No. 44313 and Gutierrez, Serial No. 36816 (9A89) responded to the Kingswood residence,

Incident No. 201221002240 (Body Worn Video available).  From reading their report or speaking with these officers, I know:

a.     The officers met with HERRLING and her "assistant," Hadley Pelletier.  HERRLING identified herself as Wilding's Trustee.  She stated that Wilding was not home and was staying with friends in the City of Carpinteria, while she was working to get the house back in order, as it was in disarray and contained black mold.  HERRLING was unable to provide a current address for Wilding, only a phone number, (818) 789-7789 (the "Wilding Landline"), which she claimed was forwarded to Wilding's cell phone number, which she said did not have.

b.     The officers attempted to call this number but were unable to connect with anyone.  HERRLING also provided a case number for Adult Protective Services, 550108. The case worker verified to the officers there is an open case; however, no contact had been made with Wilding.  Officers Abiva and Gutierrez checked the Kingswood residence with negative results. The officers also spoke with neighbors, who expressed concern as they had not seen Wilding in months.

B. Contact with Adult Protective Services

12.  On October 6, 2021, I contacted Social Worker Karolin Asadourian from Adult Protective Services.  The case was closed on Wilding on January 8, 2021.  According to Asadourian, she spoke by telephone with someone she understood to be Wilding on

- 7 -

December 22, 2020. "Wilding" told her that he was staying in Carpinteria with friends (no address given), as HERRLING had informed the police. The number the social worker had written down for Wilding was (818) 301-9256 (hereinafter, the "First Fake Wilding Number").

C. HERRLING conceals Charles Wilding's true whereabouts

13. I contacted Carrie HERRLING via telephone on October 11, 2021. HERRLING explained that she is the Trustee to the Wilding Estate and Charles is currently living in the City of Carpinteria (unknown address). She explained that she was tasked with cleaning out Wilding's home on Kingswood Rd. She provided a contact number for Wilding, the same First Fake Wilding Number provided to me by Social Worker Asadourian. I called this number (the First Fake Wilding Number, -9256) and spoke with a male named David Beach. Mr. Beach stated the number is an NBC executive number and there is no Charles Wilding connected to it. Beach has had this number for only a month or two.

D. HERRLING Obtains a New Cellular Telephone Number and Pays a Man to Use It to Pretend that He Is Charles Wilding, in Hopes of Forestalling a Missing Persons Investigation

14. I contacted HERRLING again and instructed her to provide a good telephone number and address for Wilding by October 12, 2021, or a missing persons investigation would be initiated. HERRLING contacted me on October 12, 2021, and

stated she was in the company of "Charles," and placed him on the line. The male stated he was "Charles Wilding" and he was currently staying at an address in California (hereinafter the "Fake Wilding Address"). The male said he was previously staying with friends in Carpinteria. The male identifying himself as Charles Wilding provided a current cellular phone number of (818) 860-3077 (hereinafter the "Second Fake Wilding Number"). I asked the male if he knew his Social Security Number or his California Driver License number, which he did not. The male then placed HERRLING back on the line. HERRLING explained that Wilding had changed his phone number without her knowledge, and he is now living at the Fake Wilding Address with a friend (hereinafter "HERRLING's Hireling"). As described below, this appears to have been a lie: Wilding did not obtain the Second Fake Wilding Number, as HERRLING said; rather HERRLING obtained that number, as described below. She also provided a phone number for HERRLING's Hireling, with whom she claimed Charles Wilding was staying.

15. On October 19, 2021, Detective Navarro and I responded to the Fake Wilding Address, where HERRLING said Wilding was staying. We spoke with HERRLING's Hireling, who stated that Charles Wilding did not live there. HERRLING's Hireling said he knew Wilding vaguely but had not seen him in years.

16. On March 30, 2022, I re-interviewed HERRLING's

Hireling at his home in Simi Valley.  HERRLING's Hireling stated he had lied to me during the first interview and that he does not know, nor has he ever met, Charles Wilding.  The day before I came to interview him in October, HERRLING's Hireling was contacted by Carrie HERRLING.  HERRLING told HERRLING's Hireling to tell anyone that may come to his door inquiring about Charles Wilding to say that he knew him, and the last time he saw Wilding, he had a "pocket full of money."  She paid HERRLING's Hireling $5000 and texted him a "script" on what to say.  HERRLING deposited two "Zelle" transactions into HERRLING's Hireling's bank account.  One was for $3500 and the second was for $1500.  HERRLING's Hireling does not have the text messages but stated his phone records would have a record of the correspondence between their numbers.  I obtained HERRLING's bank records pursuant to a state search warrant from Bank of America.  I was able to locate two "Zelle" transactions to "HERRLING's Hireling" on October 12, 2021 for $3500 and October 15, 2021 for $1500.

    17.  Inspector Versoza told me that on July 27, 2022, he and Inspector Noah Thompson interviewed HERRLING's Hireling at the Fake Wilding Address.  This interview was recorded.  From speaking with Inspector Versoza, I learned the following:

        a.  From a call with an intermediary for HERRLING ("HERRLING's Intermediary"), HERRLING's Hireling was informed

that HERRLING was being pressured by the Los Angeles Police Department (LAPD) who was investigating the disappearance of Wilding. HERRLING's Hireling was also told that HERRLING was also being extorted by a person named "Doyle," who threatened to reveal HERRLING's alleged probate court fraud to the police unless she paid him $50,000. HERRLING's Intermediary asked if HERRLING's Hireling could help make these problems go away, and mentioned that HERRLING was willing to pay. HERRLING's Hireling offered to make a call to a watch commander at the LAPD, whom he said he knew personally, and have the case file thrown out in exchange for $5,000. HERRLING's Hireling would also find Doyle and silence him.  HERRLING's Hireling shortly later received a $3,500 deposit into his bank account via Zelle, which he said surprised him as he had thought it was just a casual conversation. The next day, HERRLING's Hireling called HERRLING's Intermediary and complained about only receiving $3,500, when the agreement was $5,000 to which HERRLING's Intermediary explained that HERRLING could only send money in increments and promised to send the remaining $1,500. After receiving the full amount, HERRLING's Hireling told HERRLING's Intermediary that he knew a "patch holder" (a fully initiated member of an outlaw motorcycle gang) who could help them find Doyle and make him "shut his fucking mouth." He also stated that his watch commander friend would take the case file from

- 11 -

Detective O'Donnell and either throw it out or reassign it.
HERRLING's Hireling claimed that he was just acting and playing
along, but that HERRLING's Intermediary and HERRLING seemed to
believe him. A few weeks later, HERRLING's Intermediary called
HERRLING's Hireling and implied that he knew HERRLING's Hireling
had not followed through on their agreement. (I have attempted
to locate a tip or report like the one "Doyle" threatened to
make against HERRLING without success, so it appears that for
whatever reason, "Doyle" did not follow through on his threat to
expose HERRLING.)  HERRLING's Intermediary then asked HERRLING's
Hireling to lie to the police if they asked about "Chuck"
(Wilding). HERRLING's Hireling demanded an additional $10,000
for this and said he would follow a script they would write,
otherwise he would tell them whatever he wanted, to which
HERRLING's Intermediary responded by asking what would be
included in the payment and how could they trust him after he
previously scammed them. HERRLING's Hireling said that they
could either trust him or not. HERRLING's Intermediary later
told HERRLING's Hireling that HERRLING was out of the country,
which HERRLING's Hireling suspected was not true. HERRLING's
Hireling also discussed what he had heard about HERRLING's
alleged probate fraud.  HERRLING's Hireling has felony
convictions.

          18.  During the search of HERRLING's residence, inside her

phone was a text message from HERRLING to HERRLING's Hireling. In the message, HERRLING confirms that she paid him $3,500 an additional $1,500 as payment and discusses "Charles" [Wilding] and a police detective [me].  This text message corroborates some of the statements made by HERRLING's Hireling. (During her interview on January 12, 2023, HERRLING claimed that she paid HERRLING's Hireling a few thousand dollars for "rent" for Wilding – but this is inconsistent with her text message, which said that "Charles" talked with the detective "so all is good" but that she would pay HERRLING's Hireling the outstanding $1,500 nonetheless.)

19.  On October 20, 2021, Detective Navarro and I interviewed HERRLING at 2337 S. BEVERLY GLEN BOULEVARD, UNIT 6, (HERRLING'S BEVERLY GLEN APARTMENT), where she was then residing.  HERRLING explained that she is the Trustee of the Wilding Family Trust.  According to HERRLING, June Wilding, Charles' mother, named her as a secondary Trustee to Charles Wilding.  She further claimed that Charles Wilding was unable to carry out the responsibilities of the trust; therefore, HERRLING became the primary Trustee. I explained to HERRLING that Wilding was not located at the address she provided to me (the Fake Wilding Address in Simi Valley).  She seemed puzzled by this.  I verified that she was in his company on October 12th and she confirmed that she was and had picked him up at an unknown

- 13 -

address in Simi Valley.  I asked HERRLING to contact Wilding on
the phone while we were present.  HERRLING said she needed to
find his phone number and began to look around. I told HERRLING
that I had the number that was provided to me on October 12th,
(818) 860-3077 (Second Fake Wilding Number).  HERRLING called
the number and it went straight to voicemail.  She left a
message asking Wilding to call me as it was urgent.

        20.  I asked HERRLING to provide me a copy of the trust
document.  I also observed a receipt on the table from T-Mobile.
The receipt was for the purchase of a prepaid cellular phone on
October 11, 2021 at 1647 hours from the T-Mobile store located
at 10569 W. Pico Blvd in Rancho Park.  Only the last four
numbers of the purchased prepaid phone were shown on the
receipt--the same last four numbers as in the Second Fake
Wilding Number, leading me to believe that HERRLING had
purchased the prepaid phone, not that Wilding had done so
unexpectedly as HERRLING had earlier claimed.  As described
above this is the same number provided by the male, who
identified himself as "Charles Wilding".  In my training and
experience, criminals who want to hide their association with a
cellular telephone prefer to purchase prepaid ones, like the
Second Fake Wilding Number, because they do not require credit
checks.  The receipt was dated one day before the deadline I had
given HERRLING to produce Wilding or his contact information.

21.  On December 14, 2021, I contacted HERRLING requesting
an interview.  She replied that she could not attend; however,
her attorney, Alex Kessel, would be in contact.  Mr. Kessel
contacted me later that day and I explained to him that his
client (HERRLING) was the Trustee to the Wilding Estate and the
beneficiary, Charles Wilding, has been missing since late 2020.
She has stated he is in Carpinteria but could not provide an
address.  She claimed to have been in his company on October 12,
2021; however, could not provide a location of his current
whereabouts.  Mr. Kessel replied that HERRLING has no further
information regarding the whereabouts of Charles Wilding.

22.  I was contacted by a neighbor, ("Wilding Neighbor"),
who expressed concern over unusual activity that had been
occurring at the Wilding property beginning in January 2021.
This activity included many people coming and going from the
property and multiple vehicles parking on the street at all
hours of the day and night.  Wilding Neighbor provided a letter,
which was distributed by HERRLING to many of Wilding's
neighbors.  The letter explained that Wilding had been relocated
to "*the beach house in Carpinteria where he has spent summers
since childhood*" while she worked to get the Wilding property up
to code.  A contact number was left for HERRLING, along with her
"assistant," Hadley Pelletier.  I have left messages with
HERRLING and her attorney, Alex Kessel, requesting the address

- 15 -

in Carpinteria in an attempt to locate Wilding.  As of this
writing I have received no response.

E. HERRLING files a forged notarized affidavit of Charles
   Wilding

23.  In January 2021, HERRLING filed a petition in Probate
Court for Letters of Special Administration, Case No.
21STPB00406.  Among other items submitted to the Court by
HERRLING was a notarized affidavit purportedly from Charles
Wilding, dated December 29, 2020.  This document states that
Charles Wilding declines to serve as Executor of his mother's
(June Wilding) Will.  It is signed by "Charles Wilding" and
notarized by "Behrooz Yasharel".  I contacted Mr. Yasharel and
e-mailed him a copy of the notarized document.  He immediately
stated the document was forged, based on his printed name.  Mr.
Yasharel provided copies of his notary ledger, which documented
only two appointments on December 29, 2020.  None were Charles
Wilding; however, Carrie HERRLING was a client that day.  In
Inspector Versoza's training and experience, forgers will often
seek to obtain a genuine article, such as the impression of a
notary's stamp and his signature, in order to later copy it onto
a forged item in a convincing manner.

24.  It appears, based on the filings in Probate court,
that HERRLING is attempting to have the property at 3860
Kingswood Road, and all of June Wilding's assets, placed into
the Wilding Trust through a Heggstad Petition.  Also, according

- 16 -

to the documents filed by HERRLING, she is attempting to expedite the decision of the court due to possible identity theft involving some of June Wilding's brokerage accounts. HERRLING provided copies of the statements to the court, which show several mailings confirming a change of address under June Wilding's name from 3860 Kingswood Road to 3532 Bandell St Acton.  The dates for the change of address are all December 21, 2020.  Through investigation, I determined 3532 Bandell St Acton is the listed address for Annette Khoodian.  Khoodian has an extensive criminal history consisting of forgery and identity theft related crimes.  She is currently wanted on outstanding identity theft arrest warrants.

25.  I found a screen shot HERRLING took of her conversation with her co-conspirator, Kroth, dated March 16, 2021, on her cell phone during the search of HERRLING's current residence.  In the message, Kroth asked, "So what's going on with the check and other thing that came in the mail?"  HERRLING responds "I told you there can't be anymore distributions until the Heggstad Petition I granted. That hearing is now on April 26th. I totally risked it giving out even the last distribution bc ultimately I'm legally responsible for it and will be personally held accountable for it if the court were to order an accounting of the estate. The risk is significantly reduced if the Heggstad petition is granted."

26.  During the January 12, 2023 inteview of HERRLING, she claimed to never have received or taken any money from the Wilding trust.  She claimed she was working for free out of the goodness of her heart.

F. Filing of Declaration by HERRLING stating she spoke with Wilding on February 25, 2021

27.  HERRLING filed a "Declaration of service on an order shortening time" with the Court on February 26, 2021, where she declared that she contacted Charles Wilding on February 25, 2021, at the Wilding Landline, spoke with him personally, and informed him (Wilding) that she (HERRLING) would be filing an ex-parte application for an order shortening time for hearing on a PETITION FOR ORDER CONFIRMING SUCCESSOR TRUSTEE AND TRUST ASSETS.  According to the declaration, Wilding informed HERRLING that he did not oppose the petition and he would not be appearing at the hearing.

G. The Wilding Landline is disconnected.

28.  I obtained records from AT&T related to this landline at the Wilding family home at 3860 Kingswood Road, which has been in service for many years under June Wilding's name.  There were no completed calls to that phone number in the month of February 2021, when HERRLING claimed to have reached Charles Wilding on it.  In fact, the last completed call was in September 2020, which coincides with when the concerned neighbor said Wilding had gone missing.  Furthermore, Wilding has not

been seen at the property since 2020, and HERRLING claimed to have moved Wilding from the property in late 2020.  Accordingly, HERRLING's declaration that she called him at the Wilding Landline in February 2021 must be false.

H. Evidence of forgery on Lowenstein Will

29.  Through investigation, I also learned that Charles Wilding is listed as the executor and beneficiary of the Last Will and Testament for the Estate of Jackie Shields Lowenstein, Probate Case No. 20STPB02389, which is a forgery, as described below.  This Will was dated July 22, 2003, and purportedly witnessed by Jocelyn Karchok and June Wilding (Charles' mother). Jackie Shields Lowenstein died on October 18, 2019.  Her estate was valued at approximately 1.7 million dollars, which mainly included the property where she died, 4603 Mary Ellen Ave in Sherman Oaks (Los Angeles County).  The property sold at probate auction on November 3, 2021 for $1,940,000.

30.  I obtained copies of the Will, including declarations submitted to the Court to verify the signatures of the witnesses (June Wilding and Jocelyn Karchok).  These declarations were purportedly submitted by Charles Wilding, Francine Robbins (daughter of witness Jocelyn Karchok), and Caroline HERRLING and dated June 27, 2021 (Karchok's declaration), and July 30, 2021 (Wilding's and HERRLING's declarations).  According to Court documents, Wilding was represented by Attorney Rodney Gould.

- 19 -

31.  I obtained additional documents submitted to the Court regarding the estate of Lowenstein, which were purportedly signed by Charles Wilding on *April 14, 2021* and *December 19, 2021*.  It is important to note that Charles Wilding has been missing since at least September 2020.  I have personally attempted to locate Charles Wilding since October 2021 with negative results.  I also found it unlikely that Wilding--who has been described as a recluse, rarely left his home and had no visitors to his property--was the executor and beneficiary to the Lowenstein estate and was signing documents as late as December 2021, months after he had gone missing.

32.  On March 14, 2022, I contacted Attorney Rodney Gould. Gould said has never met Charles Wilding in person.  He said he was contacted by Carrie HERRLING on April 2, 2021 regarding a Will she "found" inside a safe deposit box belonging to June Wilding.  HERRLING delivered the Will to Gould's office the following week.  This was the forged Lowenstein Will, in which the executor and beneficiary is listed as Charles Wilding.  This Will was eventually accepted by the Probate Court.  HERRLING told Gould that Charles Wilding was in an assisted living facility in Northern California.

33.  On March 15, 2022, I met with and interviewed Francine Robbins regarding the declaration filed with the Probate Court verifying the signature of Jocelyn Karchok (her mother-witness)

on the Lowenstein Will.  Robbins said she never filed such a
document and that the signature on the document was not hers
(forged).  Robbins does not know, nor has she ever heard of
Lowenstein, Charles Wilding, or June Wilding.  Robbins does know
HERRLING from previous dealings, where she believes HERRLING and
her then boyfriend, James Kantor, were attempting to steal from
her through some friends that HERRLING introduced her to.
HERRLING reached out to her months ago requesting that she
authenticate a signature belonging to her mother.  Robbins
refused to do so.  Robbins believes that HERRLING is involved
with fraud and described her as dangerous.

    I. <u>Evidence of forgery on the Wilding Will</u>

    34.  On March 16, 2022, I was contacted by Attorney Rodney
Gould.  Gould noted that one of the witnesses to the Wilding
Will was an attorney named Dave Pasternak, who is now deceased.
Gould contacted Pasternak's widow, Cynthia Pasternak, regarding
her husband's signature on the Will.  Cynthia replied via email
stating that their firm specialized in receiverships and never
prepared wills for anyone.  The signature was not her husband's.

    J. <u>Interview of Hadley Pelletier</u>

    35.  On March 21, 2022 I interviewed Hadley Pelletier.
Pelletier stated she was HERRLING's "assistant" from about
October 2020 until several months ago.  She met HERRLING shortly
after college and HERRLING led Pelletier to believe she was an

attorney.  HERRLING told Pelletier that she was "essentially" an attorney and had gone through a program that allowed her to practice law in the State of California.  HERRLING explained that she specialized in Probate and Estate Law.  HERRLING was the "overseer" to the Wilding property on Kingswood Road. Pelletier assisted HERRLING with the clean-up of the property. When Pelletier got involved, Charles Wilding had already been moved.  She never met with or spoke to Charles Wilding. HERRLING told Pelletier that she and June Wilding had met while working at the Getty Center as docents and became friends. Pelletier had moved in with HERRLING for a period at HERRLING'S BEVERLY GLEN APARTMENT.  Pelletier said HERRLING would spend a lot of time on her computer.

36.  HERRLING and Pelletier disposed of all the belongings from inside the Kingswood Road residence.  Pelletier recalled that HERRLING rented large trash bins and they spent several days cleaning out the property.  Regarding a Cadillac that was registered to June Wilding and parked in the garage, Pelletier stated that HERRLING had it towed, and she does not know where it is.

37.  On March 21, 2022, I contacted Raj Kumar, Security Manager for the J. Paul Getty Center.  Mr. Kumar conducted a records search and confirmed June Wilding was an employee (Docent) at the location.  There was no record of Carrie

HERRLING.  Furthermore, Kumar remembered June personally and reached out to a friend named Donetta Rizzo, who still works there.  She never heard June speak about anyone named Carrie HERRLING.

K. Evidence of forgery on the June Wilding Trust

38.  On March 22, 2022, I was again contacted by Attorney Rodney Gould.  Mr. Gould had contacted the Law Office of Kreger and Ekizian.  The Trust document allegedly created by June Wilding was notarized by Attorney Melvin Kreger, who is now deceased.  According to Attorney Tami Ekizian, surviving partner of the firm, June Wilding was never a client and the document was forged.  On June 8, 2022, I personally contacted Tami Ekizian.  She verified that June Wilding was never a client at their office.  According to Ekizian, Kreger did not act solely as a notary.  The notary service was provided during estate planning as a convenience.  The notary books would be on file with The Los Angeles County Clerk's Office.

39.  On March 28, 2022, I contacted Larry Eckert, who lives in San Diego.  Larry's mother and June Wilding were sisters.  Charles, "Chuck" Wilding was his cousin.  Larry recalled visiting the Wilding home on Kingswood Road; however, over the last decade he had not been in contact with Charles.  Larry has never heard of Carrie HERRLING.

40.  Charles Wilding continues to be a missing person.  The

- 23 -

property at 3860 Kingswood Road is currently vacant and all
furniture and belongings have been removed.  I have interviewed
HERRLING on the phone and in person.  She either cannot or will
not provide his whereabouts.  She has claimed, through Court
declaration, that she contacted Wilding on February 26, 2021.
She claimed to be in the company of Wilding on October 12, 2021,
where he provided an address in Simi Valley and the Second Fake
Wilding Number.  HERRLING has also claimed that Wilding is in a
beach house in Carpinteria and in an assisted living facility.
Substantial evidence exists that that both the June Wilding Will
and Trust were forgeries, along with the Lowenstein Will,
listing Charles Wilding as executor.

L. Call Detail Records related to Wilding's Landline

41.  In April 2022, I received AT&T call detail records
(CDRs) pursuant to search warrant.  These records are associated
with the Wilding Landline and are for the period of June 1, 2020
– December 2, 2021.  During this time, there is outgoing call
activity until September 14, 2020.  The bulk of the outgoing
activity is to phone numbers associated with banks (Wells Fargo,
Bank of America), Life Protect medical alert company, and
Nutrisystem.  The phone activity on the account is indicative of
a reclusive lifestyle.  Beginning on November 5, 2020, it
appears a "Google Voice" number was set up on the Wilding
Landline.  Google Voice allows users to present one number to

the outside world, for instance the Wilding Landline number, while actually using an unrelated telephone to make or receive the calls.  Of note, the first number called with this "Google Voice" number was (323) 620-0858, HERRLING's cellular telephone ("HERRLING's Cell Phone").  (As described below, HERRLING has admitted that this number belongs to her).  Prior to this date, HERRLING's phone number was never in contact with the Wilding Landline.  This is consistent with HERRLING setting up a Google Voice number to imitate the Wilding family home landline, and then calling herself to see that it works.

M. Bank of America records belonging to HERRLING, KROTH, and Wilding opened between November 2020 and February 2021 showing the movement of hundreds of thousands of dollars between accounts.

42.  On April 25, 2022, I received account information from Bank of America, pursuant to a search warrant.  This information includes various accounts set up by HERRLING;

| Account Title | Account No./Date opened |
| --- | --- |
| *THE WILDING FAMILY TRUST/CAROLINE J HERRLING TRTEE U/A 7/25/13* | 3251 4940 **0550**  CHECKING OPENED: ***11/18/20*** |
| *CAROLINE J HERRLING* | 3251 4964 **3760**  CHECKING OPENED: ***11/27/20*** |
| *CAROLINE J HERRLING CHARLES H WILDING* | 3251 5417 **9070**  SAVINGS OPENED: ***03/22/21*** |
| *JASON KROTH CAROLINE J HERRLING* | 3251 5266 **9689**  SAVINGS OPENED: ***02/24/21*** |
| *JASON KROTH* | 3251 5266 **9728**  CHECKING |

| *CAROLINE HERRLING* | OPENED: *02/24/21* |
| --- | --- |

43.  I requested all applicable statements and signature cards relating to these accounts for the time period of January 1, 2020 – April 1, 2022.  I noted the account opening dates of the Wilding Family Trust/Caroline J HERRLING Trtee account ending in -0550 (the "HERRLING's Fake Wilding Trust Account 0550") and HERRLING's 3760 account ("HERRLING's 3760 Account") in November 2020 were after Wilding went missing and activity had ceased on his landline (September 2020).

44.  The joint accounts opened on February 24, 2021, under the names Caroline HERRLING and Jason KROTH concerned me because KROTH has an extensive criminal history consisting of twenty-three felony bookings and fifteen felony convictions.  The vast majority of these convictions are for burglary, grand theft, and transportation for sales of narcotics.

45.  I noted high dollar transactions through these accounts, beginning shortly after they were opened:

a.   Between November 2020 and March 2022, over $590,000 was deposited into HERRLING's Fake Wilding Trust Account 0550.

b.   On April 5, 2022, a wire transaction from Wells Fargo in the amount of $297,571 was deposited into HERRLING's Fake Wilding Trust Account 0550.

c.     *HERRLING's 3760 Account* received $375,000 from HERRLING's Fake Wilding Trust Account 0550 between November 2020 and April 2022, and $63,000 from the *Wilding/HERRLING Account – 9070* during the same timeframe.

d.     The *KROTH/HERRLING Account – 9689* received deposits totaling $280,000 on three separate transactions in October 2021.

e.     On September 27, 2021, the KROTH and HERRLING 9728 Account received a wire transfer from Wells Fargo Bank in the amount of $950,000.

N. Theft of funds in June Wilding's account

46.   I also received statements for account number *0021 3460 1986*, in the name of June Wilding.  June's account balance beginning on December 12, 2019 was $194,902.  On February 18, 2021, there was a withdrawal for $194,852 (the entire balance – minus a $50.00 recurring charge for a safe deposit box).  This withdrawal check was written to Caroline HERRLING Administrator – Estate of June W Wilding and deposited.

47.   Bank of America does have a record of a safe deposit box rented by June Wilding on July 7, 1967.  This safe deposit box is located at 16640 Ventura Bl, Encino, CA.  According to Bank of America records, this safe deposit box was accessed by Carrie HERRLING on February 16, 2021.

48.   I received Call Data Records (CDR's) relating to

HERRLING's Cell Phone.  These records are from April 2021- April 2022.  It is noteworthy that HERRLING's phone is never in contact with the phone numbers provided by HERRLING for Wilding--the First and Second Fake Wilding Numbers.

O. "Charles Wilding" sighting at HERRLING's former residence

49.  In June 2022, I discovered that Charles Wilding was being sued by various banks as a result of high credit card balances being in default.  "Wilding" was personally served in two of those suits (Wells Fargo and Citi) at HERRLING'S BEVERLY GLEN APARTMENT.  The same process server, Charles Guerin, filed a proof of service on December 21, 2021 and January 6, 2022.

50.  On August 11, 2022 I contacted Charles Guerin.  He recalled serving both documents and stated he was met by a woman at the door on both occasions with red hair in her 40's, which is consistent with how HERRLING appears.  The man identifying himself as Charles Wilding was lying in bed.  The woman stated she was the daughter of Wilding and also an attorney and was able to accept the service on Wilding's behalf.  He never verified identification for the individual purporting to be Wilding.

P. Additional Fraud on Georgette Kelly

51.  During the week of September 6, 2022, I received messages from neighbors on Kingswood Road that it appeared that individuals moved into the Wilding property.

52.   On September 12, 2022, I responded to the property and met with Georgette Kelly and Anthony DeLuca.  According to Georgette, she responded to an advertisement on Avail.com to rent the property at 3860 Kingswood Road.  She contacted "Carolyn Phoenix" and met with her at a local coffee shop. HERRLING, posing as "Carolyn Phoenix," provided a rental agreement of $4,000 per month. Georgette gave HERRLING a cash down payment of $6,075.  Georgette identified a photograph of HERRLING as "Carolyn Phoenix."  According to the rental agreement, Georgette was to send the rent payment to 12571 Capra Rd, Santa Clarita.  This location is an abandoned and boarded up property, which I visited on September 22, 2022.  The rental agreement was signed on September 2, 2022.  Georgette provided me a copy of the rental agreement signed by her and "Caroline Phoenix" (HERRLING).  It is a common tactic in real estate/rental scams for a "landlord" to meet with unsuspecting individuals and collecting rent and security deposit with no intention of renting the property or having no legal right for renting the property.  Knowing that the property was abandoned, HERRLING, using her "Phoenix" alias, appears to have created an online rental listing for it, which was answered by Georgette. HERRLING instructed Georgette to meet her a location other than the property and collected the cash "deposit."  Georgette has attempted to contact HERRLING via the phone number provided on

- 29 -

the rental agreement, (818)424-6571; however, no one has answered the line or returned her calls.

Q. Forged Power of Attorney for Wilding appointing HERRLING

53.  Attorney Rodney Gould filed a motion in court to vacate probate in the Wilding and Lowenstein matters.  According to Gould, HERRLING has contested this motion and is represented by Attorney H. Todd Stevenson.  There was some discussion in court that Stevenson had some information regarding Wilding's whereabouts.

54.  I contacted Stevenson by phone on September 22, 2022. Stevenson provided me with a copy of the Power of Attorney (POA) for Wilding, appointing HERRLING as the agent.  I noticed the POA was dated, signed, and notarized on November 23, 2020.  The notary was Abraham Kanaan.

55.  I interviewed Kanaan on October 19, 2022.  Kanaan reviewed his notary ledger in my presence and located the entries for November 23, 2020.  HERRLING was a client on that date; however, Wilding was not.  Moreover, the document HERRLING had notarized (according to the ledger) was an affidavit for collection of personal property.  Kanaan reviewed the notarized "Certificate of Acknowledgement" on the POA listing the names of Charles Wilding and Caroline HERRLING.  According to Kanaan, the handwritten name of Charles Wilding was not his.  Furthermore, it was Kanaan's opinion that his signature on the second page of

- 30 -

the acknowledgement was altered.  Kanaan stated that both
Wilding and HERRLING would have needed to be present to notarize
the POA.

   R. <u>The Wilding Family Trust Was Forged</u>

   56.  In November 2022, Attorney Rodney Gould filed a
petition for probate on behalf of Larry Eckert for the Wilding
estate.  HERRLING, through her attorney, H. Todd Stevenson,
filed an objection.  The objection states, in part, "June
Wilding, with her attorney, Hamid Soleimanian, Esq., created a
Trust and Pour Over Will, both of which were signed, dated,
notarized, and witnessed by two witnesses on July 25, 2013."
Stevenson referenced and attached a letter from Soleimanian to
June Wilding dated August 5, 2013 referencing the trust.  This
letter was provided by HERRLING, purportedly establishing the
authenticity of the June Wilding Trust.

   57.  Mr. Gould provided me a copy of the letter written by
Soleimanian and dated August 5, 2013.  The letter is addressed
to June Wilding at the Kingswood Road address with the subject
line: The June W. Wilding Living Trust Dated July 25, 2013.  The
letter references the attached original and copy of the June W.
Wilding Living Trust and states the importance of transferring
her assets into the trust.  The letter purports to be signed by
Hamid Soleimanian.

   58.  On November 15, 2022, I interviewed Hamid Soleimanian

at his office.  Soleimanian was shown a copy of the letter and Trust.  He stated that the letter was forged, and someone obtained his letterhead and stock signature.  After checking his records, he determined June Wilding was not a client of his. Furthermore, after examining the Trust document, he explained the structure and format are not consistent with his office.

59.  It is important to note that according to HERRLING and the filings in Probate Court, the Trust was drafted by Soleimanian; however, it was notarized by Melvin Kreger.  Kreger was an estate planning attorney, and according to the surviving partner (Ekezian), June Wilding was not a client.  The Trust is dated July 25, 2013.  The notary stamp by Kreger is dated July 25, 2013 and the letter from Soleimanian is dated August 5, 2013.  On December 8, 2022, Attorney Rodney Gould informed me that he had spoken with Soleimanian regarding the Wilding Trust. Soleimanian has never worked with, and never met, Melvin Kreger.

S. Fraud on Robert Tascon's property, 5309 Louise Ave, Encino, CA. by HERRLING and KROTH

60.  I have received substantial assistance in this investigation from Inspector Lyndon Versoza, United States Postal Inspection Service (USPIS).  Inspector Versoza was provided the bank records obtained by State Search Warrant from Bank of America pertaining to HERRLING's accounts detailed above.

61.  Of note was a wire transfer on September 27, 2021 in

the amount of $950,000 into the joint account held by HERRLING and KROTH, ending in 9778.

62.   Through investigation, it was determined this deposit was related to the proceeds from the sale of a property located at 5309 Louise Ave, Encino, CA 91316 in Spring 2021 ("Tascon Property").

63.   Gloria Payne, Fraud Review Administrator for Fidelity National Title Group alerted Law Enforcement regarding possible identity theft and forgery relating to the sale of the Tascon Property.

64.   In a letter dated June 24, 2022, Payne explained the former owner of the property, Robert Tascon, contends that his signature on the Grant Deed and other sale documents, transferring title to Land Developer and Associates Corp (LDAC)., were forged.  According to Payne, one of the owners at LDAC, Steven Tobias, was approached by a woman named Caroline Phenix (one of HERRLING's aliases).[2]  Phenix represented herself as a licensed California attorney representing property owners in distressed situations needing to sell.  Phenix showed Tobias multiple properties, including the Louise property.  LDAC

---

[2] Her California Driver's License, SSN, and one arrest (for prostitution) in 2011 are all in the name CAROLINE HERRLING.  However, her social media, which shows her photograph, is all in the name CAROLINE PHENIX.  Many other records, including lawsuits, also show her name as PHENIX.  Her credit report lists both names and shows an additional alias of Caroline "Gardiner."

entered into a purchase and sale agreement for the property, purportedly with Tascon, for $1.5 Million.  On September 8, 2021, escrow instructions were executed, and the sale proceeds distributed.  $950,000 was transferred into the Bank of America account held by HERRLING and KROTH.

65.  An additional proceeds check in the amount of $343,131 was personally retrieved by KROTH from the escrow company and deposited into an E*Trade Account allegedly held by Tascon. Tascon, however, claimed he never opened this account.

66.  The signature on the Grant Deed dated September 14, 2021 was notarized by Anne Marie Lim Ayunyan.

T.  Forged notary signature for Grant Deed

67.  Los Angeles Police Department Detective M. Segura, Serial No. 32218, Commercial Crimes Division, Real Estate Fraud Section, told me they received the letter from Gloria Payne and completed an Investigative Report (IR) titled "Forgery," LAPD DR No. 22-1016334.  Detective Segura obtained the Notary Journal from Ayunyan containing the entry for the notarized signature of Tascon with his thumbprint.  Detective Segura submitted that thumbprint for comparison examination to Tascon's thumbprint on his California Department of Motor Vehicle Driver License.  It was determined they did not match.

68.  On October 14, 2021, Tascon, through his attorney, contacted LDAC and claimed the sale was fraudulent.

69.   According to police reports, Tascon died on September 11, 2022, in Abilene, TX.  The police determined that Tascon, who died of a single gunshot to the head, committed suicide. Their report noted that he had a history of mental illness and was involved in fraud litigation (regarding the property that HERRLING, posing as Phenix, had sold using an imposter Tascon). The police report indicated that there was no witness to the shooting, and that Tascon's body was cold by the time it was discovered in the evening.  The last person to see Tascon alive that morning, a housemate, indicated that Tascon seemed fine when he spoke to him before leaving for work.  There was no suicide note.

U. Forged Power of Attorney by HERRLING to Obtain funds from the Fraudulent Sale of the Tascon Property;

70.   On December 7, 2022, I reviewed escrow records from the Tascon property.  From my review I observed an email correspondence from HERRLING, using her Caroline Phenix alias, and the escrow officer, Janice Yeh:

---

**Janice Yeh**

| | |
|---|---|
| From: | Caroline Phenix <carolinephenix@icloud.com> on behalf of Caroline Phenix |
| Sent: | Friday, September 24, 2021 11:03 AM |
| To: | Janice Yeh |
| Subject: | Re: 5309 Louise Ave, Encino, CA 91316 / 2839-jy - seller's net proceeds |
| Attachments: | 2839-jy.seller net..pdf; Untitled attachment 00185.htm; ca all-purpose acknowledgment.pdf; Untitled attachment 00188.htm |

Hi Janice,

Robert informed me this morning that there was an issue with the Instructions of Net Proceeds and that it had to be done again. Therefore, I just wanted to let you know that he has notarized it again and I have the original document in my possession. I will scan it to you in a separate email.  As you mentioned, you will require the original to distribute funds per the instructions.  So I'm assuming I should jump in the car and head to you now. or I can always Fedex them again. I can do whatever will get funds released today as I don't want to cause any delays. Please advise.

Best,
Caroline

Sent from my iPhone

On Sep 23, 2021, at 1:59 PM, Janice Yeh <janice.yeh@eglobalescrow.com> wrote:

---

a.    In an email chain from September 22 through September 24, 2022, HERRLING corresponded with the escrow officer, Janice Yeh.  HERRLING appeared to be coordinating the release of funds of the fraudulent sale of the Tascon property to her co-conspirator, KROTH.  In this chain of emails, Yeh sent an email to white.sand@yahoo.com who she believed was Tascon. Yeh told HERRLING (who as described below was posing as Tascon), that she could not release the funds to KROTH, only to Tascon

since they did not have a notarized Power of Attorney from
Tascon granting the power of attorney from Tascon to KROTH.
HERRLING responded to Yeh that she indeed has a copy of the
Power of Attorney from Tascon and offered to personally drop off
the copy to Yeh.

71.   On December 8, 2022, I looked at records from
Yahoo.com and learned that the email white.sand@yahoo.com was
opened and registered to HERRLING's Cell Phone.  HERRLING used
this number to call the attorney for the buyer of the property
and told the attorney that that number belongs to her.  I
believe that when the escrow officer communicated with Tascon
through the white.sand@yahoo.com email, she was actually
communicating with HERRLING.

72.   I also reviewed the Power of Attorney document
provided by HERRLING to Janice Yeh.  Based on this document,
Postal Inspector Versoza told me that an agent in his office
spoke with the notary public who notarized the document.  The
notary provided his log for that notarization to the Postal
Inspectors.  I reviewed this document and compared the
fingerprint to Tascon's California driver license and determined
that it did not belong to Tascon.  I also observed that the
California ID listed in the log was not Tascon's true California
Driver's License number.  I believe that the Tascon power of
attorney document which Janice Yeh needed before she released

the funds to KROTH was a counterfeit.

73.   On December 12, 2022, I reviewed records I obtained from Google for HERRLING's Google email account.  Among the saved images in HERRLING's Google email account was an image of a counterfeit California Driver's License bearing the name Robert Tascon, but with a photograph of an unidentified man who is not Tascon.  This counterfeit driver's license number is the same number in the notary's logs, confirming that the document HERRLING provided to the escrow company was counterfeit.

74.   During my interview of HERRLING on January 12, 2023, HERRLING told me that she had nothing to do with the sale of the Tascon property.  She claimed all she did was drive Tascon to the notary and was paid only a small amount, maybe $150.  When I asked her to describe Tascon, HERRLING could not.  She said he was wearing a hat and a mask so she could not describe him. Later when confronted about her profiting from the sale of Tascon's house ($950,000, discussed below), HERRLING did not deny it, saying that she did not leave Tascon destitute. HERRLING could not explain what she had done to justify getting the $950,000 that she and Kroth took from the sale of the Tascon property. HERRLING admitted to controlling the white.sand@yahoo.com email.

V. HERRLING'S  WOODLAKE  RESIDENCE  Was  Purchased  with  Fraud Proceeds

75.   On December 7, 2022, I reviewed records from bank of

America and learned that HERRLING used funds obtained from the fraudulent sale of the Tascon property to purchase HERRLING'S WOODLAKE RESIDENCE.  HERRLING'S WOODLAKE RESIDENCE is where HERRLING currently resides:

a.     On or about September 27, 2021, $950,000 which was obtained through the fraudulent sale of the TASCON property was deposited into Bank of America Account ending in -9728 (the "KROTH and HERRLING 9728 Account").  The KROTH and HERRLING 9728 Account was opened under the name of Jason KROTH and Caroline HERRLING.

b.     Between March 2021 and September 2021, in three transactions the KROTH and HERRLING 9728 Account transferred $381,500 to HERRLING's 3760 Account at Bank of America.

c.     Between January and March 2022, $409,235 in funds held in HERRLING's 3760 Account moved to the escrow company to purchase HERRLING'S WOODLAKE RESIDENCE.

W. HERRLING Purports to be an attorney and evades taxes

76.   On December 14, 2022, I reviewed the California Bar Association website and found that the California Bar sent Caroline J. Phenix a "Cease and Desist" notice on February 12, 2021.  According to the website, the California Bar issues a Cease and Desist notice when "the investigation uncovers an isolated instance of UPL (Unauthorized Practice of Law)."

77.   On December 14, 2022, I reviewed records from the

California Franchise Tax Board.  From this review I learned that HERRLING has not filed taxes since 2015.

X. <u>The Search of HERRLING's Current and Former Residences</u>

78.  On January 6, 2023, Chief U.S. Magistrate Judge Stevenson issued search warrants for the current and former residences of HERRLING, which I and other law enforcement officers executed on January 12, 2023.

Y. <u>Defendant's Current Residence Contained Her Private Office which Was Full of Evidence of Fraud</u>

79.  On January 12, 2023, I reviewed the evidence recovered from HERRLING's current residence, 8361 WOODLAKE AVENUE, WEST HILLS, CALIFORNIA 91304.  I learned that law enforcement discovered an office which HERRLING said was hers.  Inside this office were numerous identity documents (fake and stolen driver license, California ID), credit cards, social security cards, birth certificates and passports not in HERRLING's name.  Some of the fakes were found in HERRLING's emails, including a different fake ID bearing the face of an individual not Robert Tascon but with his identifying information.  Other fakes appeared to be in the process of production, with untrimmed ID cards printed on photopaper.  Additionally found in HERRLING's residence was a machine that appeared to make documents look older.  According to Inspector Thompson, this machine would be useful in forging Wills and Trust documents by making them appear aged and therefore not recent forgeries. Also found was a

CNC Router Drawing Robot Kit, which allows a computer to sign and forge exact copies of signatures. Also found were pieces of paper that appeared to be rehearsed signatures of June Wilding's signature. Additionally, I learned that counterfeit US Savings Bonds were recovered.  Inspector Versoza told me they were counterfeit as one of the sheets had a dried wet spot where the ink bled.  Inspector Versoza told me that the ink of an authentic US Savings Bond should not run.

80.   During an interview of HERRLING, HERRLING said that the office belonged to her.  She also admitted the Wilding, Lowenstein, and Tascon documents belonged to her.  She also admitted that she has in her possession Lowenstein's valuable property including art, and collectibles, which she is selling. HERRLING stated that she is allowed to sell these items for the executor of the Lowenstein trust.

81.   HERRLING's boyfriend, Samuel Shtolzberg ("Shtolzberg") who was present at the house during the search said that he shared the bedroom with HERRLING but that all the documents belonged to HERRLING.  He said the office belonged to HERRLING and he does not have access to it.  He has only been inside the office with her present.

82.   Shtolzberg also said that the HERRLING residence was being ran as a sober living residence.  I believe this means that rooms were being rented to drug addicts who were working on

- 41 -

their sobriety.  Shtolzberg said that the sober living residents
were primarily fentanyl addicts, and that they are not allowed
to have drugs in the house.  Shtolzberg said that when HERRLING
and he smoked methamphetamine, they did so out of sight of the
fentanyl addicts.

Z. HERRLING Possessed a Look-Alike Passport

83.  Additionally, some of the stolen identities appeared
to belong to people who are not HERRLING but have a strong
resemblance to HERRLING.  This included:

a.  A United States Passport in the name of Andrea
Gomez.  Andrea appears to have a similar complexion and hair
color as HERRLING.

b.  A California identification card in the name of
Lauren Chapdelaine who also had red hair and similar complexion
to HERRLING.

c.  A California Driver License in the name of Carly
Betkey.  The photo on this Driver License is of a woman, also
with red hair and similar complexion to HERRLING.

AA.  HERRLING  Possessed  Many  Drugs,  Including  for
Distribution

84.  At HERRLING's current residence, officers found
various drugs in HERRLING's bedroom, the garage, and a safe in
her office.

a.  HERRLING's bedroom contained substances that
appeared to be illegal drugs, such as psilocybin, heroin, and

- 42 -

methamphetamine.  This included ten gross grams of psilocybin in
a sandwich bag; several small baggies totaling four gross grams
of methamphetamine, according to a "Tru-Narc" narcotics
analyzing device; and several baggies of brown powder substance,
and several pieces of brown tar-like substance wrapped in foil,
which appear to be heroin.  One of the substances appears to be
a cookie-sized puck that had been pressed.  A search team member
observed a molding press in HERRLING's residence that appeared
to match it, suggesting that someone in HERRLING's residence
made the puck, as drug traffickers, not users, would do.  These
substances have not been confirmed to be narcotics, but appear
to be heroin combined the heroin-like substance weighed about 65
gross grams.

85.   In HERRLING's office was a safe that HERRLING
said belonged to her.  She said she did not remember the code
and there was nothing in this safe.  Law enforcement forced open
the safe and found an additional eight gross grams of
methamphetamine-like substance.  This substance was later tested
by Tru-Narc and also tested positive for methamphetamine.  When
I interviewed HERRLING, she claimed to be surprised that drugs
were found in her safe.

86.   Shtolzberg told me that the drugs in the garage
were methamphetamine and the scale along with the two guns in
the backpack belonged to him.  He said he shared the

methamphetamine with HERRLING.  Shtolzberg also said that the
other drugs in the house belonged to HERRLING (i.e., the heroin
and mushrooms, and the methamphetamine in the safe and bedroom).
Shtolzberg said that he and HERRLING were both regular users of
methamphetamine. Shtolzberg said that the residence was a sober
living facility so he and HERRLING would use drugs away from the
sober living residents such as in their bedroom.  He said drugs
confiscated from the residents of the sober living program were
immediately flushed. From my observations the HERRLING bedroom,
which sat above the garage and the garage itself are separated
from the rest of the residences by a wall.  The bedroom and
garaged were only accessible from outside the structure.

        87.   Inspector Versoza told me that in his office, he
weighed the four bags of methamphetamine in the garage that
Shtolzberg talked about. The bags of methamphetamine weighed
about 75 gross grams.  Also found in the garage was several
small baggies of black tar-like substance.  This substance was
tested with a field test kit as positive for opiates.

        88.   I learned from multiple law enforcement sources,
including an LAPD drug expert, the following:  A dose of
methamphetamine is often one tenth of a gram, so the seized
methamphetamine would represent several hundred doses.  Users
would not need a scale or extra baggies, as were found in
HERRLING's residence.  It is unusual for mere users to possess

or carry firearms, especially assault rifles, but that dealers often keep firearms on their persons or in their residences to defend their stashes from persons who might otherwise rob them.

89.   I reviewed messages in HERRLING's phone and found a message dated December 14, 2022 from "Brandon" in which he appeared to want to purchase drugs through HERRLING. His text message to HERRLING said "Hey carrie what's up, can you come talk to me please Was just wondering if we could still order weed."

90.   In a message from Shtolzberg to HERRLING, dated December 3, 2022, Shtolzberg tells HERRLING: "you cannot discuss our business with anoyone other than you and I.  Think of how that looks with him selling dope and you are talking about work with him."

91.   During the interview of HERRLING, she claimed that she has used drugs in the past, but was not currently a drug user, and did not need drug rehabilitation.

BB.   HERRLING Possessed Loaded Guns and Fake Badges

92.   Found in HERRLING's home were numerous guns, including assault rifles, handguns and un-serialized "ghost" guns that cannot be traced.  Many of these guns were loaded, including one found in HERRLING's purse. In the closet of her bedroom, on display were several assault weapons including AR15 type guns, AR15 receivers, a shotgun and magazines:

- 45 -



93.   Also secreted in HERRLING's bedroom near her bed was a gun stash that required the use of magnets to uncover.  Also, beside her bed was a ghost gun.

94.   In the garage of the house were additional handguns and rifles tucked in various corners. Inspector Versoza told me that in total we recovered from the residence 16 guns.  Two were

- 46 -

ghost guns, 1 shotgun, six receivers, five pistols, one slide and one rifle. Many of these guns were loaded.

95.   Based on my training and experience, and the placement of these loaded guns, it appeared that the guns were placed for easy access and allowed HERRLING and Shtolzberg to defend the residence from an attack.

96.   During the interview of HERRLING, she admitted to owning some guns.

97.   During the interview of Shtolzberg, he said that the guns hanging in the closet belonged to HERRLING.  He only owned two guns where were in his backpack in the garage. Shtolzberg said that he and HERRLING would often go to the shooting range to practice.

98.   Found in HERRLING's office were two authentic looking but likely fake federal law enforcement badges: one for the Drug Enforcement Administration and the other for the US Diplomatic Security Service.  I believe they are fake because these badges were not serialized.  In HERRLING's bedroom was a serialized badge for a Beverly Hills Police Detective. Inspector Versoza told me he spoke with a Detective at Beverly Hills Police who said that the badge appeared to be a reproduction.

99.   During the interview of HERRLING, she admitted that the badges belonged to her, but claimed that she just used them as "costume" and denied ever representing herself as law

enforcement.



100.

CC.    <u>Defendant Appears to Have Conducted Other Estate Frauds
   and was Selecting Targets for more Victims</u>

101.  During the search of 8361 WOODLAKE AVENUE, WEST HILLS,

CALIFORNIA 91304 officers found a digital spreadsheet with a tab

called "Heir Index".  This index listed a column with property

ID numbers and a column labeled "Heir's Name."  A third column
was labeled "Entitled Amount", a fourth Column said "Current
Balance".  In this spreadsheet I saw dozens of rows of data.
Another tab called "Estates file" listed decedent's names and
aliases as well as properties and heir.  There were searches on
HERRLING's digital devices for "millionaire" and "obituary,"
suggesting that she was looking for rich dead persons who would
be good targets for her inheritance fraud scheme.

102.  Also found were screen shots of mail forwarding where
HERRLING documented occasions where she diverted mail from an
address in Acton CA to her BEVERLY GLEN residence were found in
her phone.

DD.   Defendant Refused to Provide the Passcode to Her Digital
      Devices.

103.  During the execution of the search warrant at her
residence, HERRLING refused to provide the passcodes to her
digital devices.

104.  During the interview of HERRLING, I used a ruse to ask
for a phone number of a person HERRLING was describing.
HERRLING unlocked her phone to give me the number, which allowed
to take her unlocked phone.  The unlocked device allowed me and
other officers to review her phone, but this is temporary and
only allows me to look at the contents before the phone locks
itself.  Also in this mode, I know that computer forensics
cannot download the data without the passcode.

105. At 2337 S. BEVERLY GLEN BOULEVARD, UNIT 6, LOS ANGELES, CALIFORNIA 90064, HERRLING's former residence from which she has been locked out for failing to pay rent since August 2022, officers informed me they found among other evidence were evidence of HERRLING's forgeries and fraud including stolen mail, a passport in the name of Norman Lowenstein, checks addressed to the Wilding Family Trust, boxes photos and mail in the name of Charles Wilding, power of attorney documents, tax and bank documents, documents in various victims' names, and files in various victims' names.

106. Officers also found dozens if not hundreds of file folders.  Inside the file folders appear to be documents where HERRLING acts as a criminal attorney for clients.  For example:

a.    One manila folder labeled "Mike Kollar" had numerous handwritten and printed documents.  Printed was a sheet called "Criminal Case Summary", a bail bond agreement, and handwritten notes that had written words like "Accepted Bond, file with city mistaken identity bonded out."

b.    Another manila folder labeled Rodriguez had an invoice for $3,000 for litigation support services from a company called "Publicly Correct" at HERRLING's BEVERLY GLEN Address.  Also inside the folder was handwritten notes that said things like "Request to Judge for Drug Court Romero Motion (10-15 hours)" and additional notes see below attached image I took

of the file.



  c. Other folders contained documents that showed

that HERRLING using the name Phenix is the owner of Publicly

Correct. For example a letter from the Santa Clara County office

of County Counsel sent a letter addressed to "Caroline Phenix,

Managing Partner Publicly Correct."  The letter appears to be

correspondence with the attorneys for the county about why they are denying her request for a grievance hearing for her client. Inside the folder were numerous invoices for thousands of dollars for he travel, "reviewed of attorney's files," "preparation for hearing" and other line item billing descriptions.

      d.    On January 13, 2023, I conducted an online search and found a LinkedIn page for Caroline Phenix, which included a photo I recognize as HERRLING.  This LinkedIn profile says that she is the "Founder and Managing Partner at Publicly Correct."

107. Inspector Versoza told me that in his training and experience, most electronic transactions and communications cause an interstate wire, even when the recipient and sender are in the same state.  Businesses such as banks and telecommunication providers regularly route signals through digital hubs, and send them also to back-up servers to protect the data, which typically involves the signals crossing state lines.

      ///

IV. **CONCLUSION**

108. For the reasons stated above, there is probable cause to believe that CAROLINE HERRLING violated 18 U.S.C. §§ 1028A, 1343, and 1349, and 21 U.S.C. § 841(a)(1).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 13th day of January, 2023.

_____
UNITED STATES MAGISTRATE JUDGE