E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
      1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-0102
      Facsimile: (213) 894-6269
      E-mail:    andrew.brown@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br><br>CAROLINE JOANNE HERRLING,<br>  aka Carrie Phenix,<br>  aka Caroline Gardiner,<br><br>              Defendant. | No. **2:23-MJ-165-DUTY**<br><br>**GOVERNMENT'S SUBMISSION IN SUPPORT OF REQUEST FOR DETENTION**<br><br><br>Hearing:  January 17, 2023<br>          2:00pm<br>          Courtroom 880, Roybal |

**INTRODUCTION**

Defendant CAROLINE JOANNE HERRLING, aka "Carrie Phenix," aka "Caroline Gardiner" ("defendant") has been charged with a years' long conspiracy to commit wire fraud, aggravated identity theft, and possession with intent to distribute heroin and methamphetamine, among other drugs.  As explained below, defendant presents a risk of both flight and obstruction of justice, and a danger to the community, and therefore should be detained.

## I.   Legal Standards

The Bail Reform Act of 1984 (the "Act") requires pretrial detention of a defendant where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Courts must consider several factors when determining whether there are conditions that could reasonably assure the appearance of defendant and the safety of the community, including: (1) the nature and seriousness of the offense charged; (2) the weight of the evidence against defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).

Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985); United States v. Kouyoumdjian, 601 F. Supp. 1506, 1508-10 (C.D. Cal. 1985).  A finding that a defendant is at risk of flight need only be supported by a preponderance of the evidence.  18 U.S.C. § 3142; United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991). Furthermore, the Ninth Circuit has made clear that economic danger can be a basis for detention.  United States v. Reynolds, 956 F.2d 192 (9th Cir. 1992); see also United States v. Possino, No. CR 13-0048-SVW-3 (JEM), 2013 WL 1415108 (C.D. Cal. Apr. 8, 2013); United States v. Cohen, 2010 WL 5387757 (N.D. Cal. Dec. 10, 2010).

A bond will not mitigate the risk of danger.  S. Rep. No. 225, 98th Congress, 1st Sess. 1983, 1984 U.S.C.A.N. 3182, 3198-99 (n.60) (Congress finding that "a defendant who is a danger to the community remains dangerous even if he has posted a substantial money bond")." See also United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991) ("$100,000 security bond, cosigned by two financially responsible persons, strict pretrial service agency supervision and restriction of travel" and the "existence of four cosigners and $10,000 cash may assure the appearance of [defendant] at trial but will not secure the safety of the community").

The Ninth Circuit has recognized that where a defendant has access to vast sums of cash, any proposed bail amount is likely to be illusory.  United States v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990) ("The purpose of bail is not served unless losing the sum would be a deeply felt hurt to the defendant and his family; the hurt must be so severe that defendant will return for trial rather than flee").

Here, the court already determined that there was probable cause to believe that defendant violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  Even if the weight of the substances seized were infinitesimal, that would nonetheless carry a statutory maximum penalty of 20 years in prison.  Where there is probable cause to believe a defendant committed an offense for which a maximum imprisonment of ten years or more is prescribed in the Controlled Substances Act, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure defendant's appearance as required or the safety of the community. 18 U.S.C. § 3142(e)(3).

## II.  Defendant Is a Danger

Defendant's last two known victims died under dark circumstances.  Charles Wilding's body has never been found despite efforts to do so spanning two years.  All that is clear about his disappearance is that defendant was in control of disposing of the contents of his residence, and that thereafter defendant repeatedly and inconsistently lied to the police, lawyers, and the courts about where Wilding was, and manufactured false evidence that he was alive and she was in contact with him.  (Aff. ¶¶ 9-41, 49.)

Robert Tascon died of a gunshot wound to the head after complaining that he had been defrauded out of his one asset, a home he had inherited.  It is undisputed that defendant received at least $950,000 from the sale of that home even though she could not come up with any justification for having received such a windfall.  Indeed, before the agents confronted defendant with documentary evidence that she had used to proceeds of Tascon's property to purchase her own personal house—which precipitated her admission of the same—she claimed that her only involvement in the sale was driving Robert Tascon to the notary, for which she thought she had been paid about $150.  (Aff. ¶¶ 60-74.)

Even assuming that Tascon committed suicide—and there was no suicide note, no witnesses, and the last person to see Tascon alive said he was in fine spirits (Aff. ¶ 69)—his death would show the extraordinary danger defendant poses to the community.  Identity theft is a devastating crime, and stripping a troubled man of his only asset could push him over the edge.

4

Of course the danger defendant poses to the community is also economic.  While her documented history of fraud in this case proves that she has long posed an economic danger to the community in the past, evidence discovered at her house shows she planned to continue it.  She possessed special equipment to age paper (the better to make recent forged wills appear old an authentic), copy signatures, and a variety of stolen and forged identity documents.  Her digital devices also had recent searches for "obituary" combined with "millionaire" which shows how she located victims for her scheme.  She also possessed a spreadsheet that listed these persons, their assets, and whether or not they had known heirs, so that she could pick the richest and easiest targets.  (Aff. ¶ 101).  Defendant admitted that she is in the process of liquidating the valuables she gained through the (forged) Lowenstein will.  (Aff. ¶ 80.)

Defendant also possessed distribution quantities of heroin and methamphetamine, among other drugs (Aff. ¶¶ 84-88), a variety of firearms, and multiple counterfeit or stolen law enforcement badges. In total, there were 16 firearms in her house.  Just affixed to the back of her bedroom closet door were nine firearms, including assault rifles and shotguns.  Some of the weapons were untraceable "ghost" guns without serial numbers.  Many were loaded, including the pistol defendant kept in her purse.  She had a ghost pistol beside her bed and another one in a secret stash that required magnets to open. Defendant admitted that she had some guns.  (Aff. ¶¶ 92-96). Defendant's possession of so many loaded and untraceable firearms is particularly troubling because she had counterfeit badges for the DEA, U.S. Diplomatic Security Service, and Beverly Hills Police

Department, suggesting that she passed herself off as law enforcement.  (She admitted to owning the badges, but denied using them improperly).  (Aff. ¶¶ 98-100.)  Defendant's involvement with drugs, including her use of methamphetamine (Aff. ¶ 82), further suggests that her strewing loaded and unlocked firearms throughout her home was for a criminal purpose (Aff. ¶ 95) and in any event is extremely dangerous.

**III. Defendant Has Already Obstructed Justice and Will Continue to Do So**

Defendant's specialty is obstruction of justice.  She uses sophisticated forgeries, power of attorney, identity theft, and fake notary stamps in order to manipulate lawyers, courts, and other victims into giving her control of a victim's assets.  Further, whenever her scheme begins to unravel, she has one response:  more obstruction of justice.  First, defendant had the body of Charles Wilding disposed of to obstruct justice by hiding his death.  Then when the police investigated Wilding's disappearance, defendant created a variety of sham addresses and telephone numbers for him to throw them off the trail, including purchasing a prepaid telephone for "Wilding" and setting up a Google Voice number to suggest he was alive.  (Aff. ¶¶ 20, 41.)  When that did not satisfy the police, defendant hired a man to lie to them as a purported eyewitness:  he was supposed to tell the authorities that Charles Wilding was alive and rich and had been living with him before going off to parts unknown.  She also hired him to intimidate someone who had threatened to expose her scheme to the police.  (Aff. ¶¶ 14-18.)  Defendant also had someone pretend to be Wilding on multiple occasions, and even claimed herself to be his daughter when accepting service of process.

1   (Aff. ¶¶ 49-50.)  Victims who know defendant and her associates

2   described them as "dangerous."  (Aff. ¶¶ 9, 33.)

3   **IV.  Defendant Is a Flight Risk**

4         No combination of conditions will reasonably assure the

5   appearance of defendant as required under 18 U.S.C. § 3142.  First,

6   defendant committed her fraud under the alias "Carrie Phenix"

7   precisely to avoid being held responsible for her crimes.  Second,

8   defendant possessed multiple look-alike identity documents, including

9   a U.S. Passport, all in the names of other individuals.  (Aff. ¶ 83).

10  Defendant could use similar identity documents to flee or to adopt a

11  new identity, like her "Carrie Phenix" one, now that her given name

12  is linked to this case.  Third, defendant took over at least three

13  real properties worth over $5 million in total.  While the

14  investigators have attempted to locate for forfeiture the proceeds of

15  defendant's scheme, they have been unable to do so with the exception

16  of approximately $409,235 from the Robert Tascon fraud that was used

17  to purchase the house in defendant's name that contained the drugs,

18  guns, and evidence of fraud.  (Aff. ¶ 75(c).)  Instead, the

19  investigators have found a dizzying array of transfers to co-

20  conspirators, including to straw accounts held in the names of

21  identities defendant controls, such as Robert Tascon and Charles

22  Wilding, which are now empty or nearly so.  (Aff. ¶¶ 24, 42-46, 60-

23  61, 64-65.)  Defendant, therefore, has hidden resources which could

24  be used to fund her flight.

25  **V.   There Is No Reason to Believe Defendant Would Comply with Any
         Conditions of Release Imposed by the Court**

26

27        Defendant has a history of ignoring court orders, administrative

28  actions, and criminal investigations.  Indeed, the heart of her fraud

is conning courts into giving her control of the assets of victims, either as trustee or through power of attorney.  (Aff. ¶¶ 23-27, 29, 32-34, 38, 53-59, 60-69, 70-74.)  Her promise to abide by court supervision now would be meaningless.  Further, even after the state bar issued a "cease and desist" letter against her for the unauthorized practice of law, she continued to do so.  (Aff. ¶¶ 64, 76, 106.)  Similarly, even while being investigated by the LAPD regarding the disappearance of Charles Wilding, defendant stole and sold Robert Tascon's property, leading to his demise.  (Aff. ¶¶ 9-14, 60-69.)  And even while being sued over the fraudulent sale of Robert Tascon's property, defendant nonetheless hunted for still more victims.  (Aff. ¶ 101.)  Defendant's extraordinarily brazen and reckless crimes while under both investigation and "cease and desist" warnings show that she is simply incapable of conforming her actions to any kind of supervision--likely because of defendant's addiction to methamphetamine.  Accordingly, there is no reason to believe that would comply with any conditions of the release that the Court might otherwise have been inclined to impose.

## CONCLUSION

For all the reasons discussed above, the government respectfully requests that this Court find that defendant presents a risk of flight and danger to the community that cannot be mitigated by any bond or conditions of release, and order her detained.

Dated: January 17, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 */s Andrew Brown*

                                 ANDREW BROWN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA