E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102
    Facsimile: (213) 894-6269
    E-mail:   andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>CAROLINE JOANNE HERRLING,<br>  aka "Carrie Phenix,"<br><br>       Defendant. | No. 2:23-CR-59-MEMF<br><br>GOVERNMENT'S SENTENCING POSITION; DECLARATION OF INSPECTOR VERSOZA; EXHIBITS<br><br>Sentencing:  February 9, 2024<br>              2:00 p.m. |

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES..............................................ii

I.   PROBATION CORRECTLY CALCULATED DEFENDANT'S GUIDELINE RANGE....1

     A.   THE +18 LOSS ENHANCEMENT WAS CALCULATED CONSERVATIVELY...1

     B.   THERE WERE MORE THAN 10 VICTIMS.........................3

     C.   DEFENDANT ABUSED A POSITION OF TRUST....................6

     D.   DEFENDANT WAS AN ORGANIZER AND LEADER OF AT LEAST FOUR
          OTHER PARTICIPANTS......................................8

          1.   DEFENDANT DIRECTED THE ACTIVITIES OF KROTH.........9

          2.   DEFENDANT DIRECTED THE ACTIVITIES OF KANTOR.......11

          3.   WILKINS WAS A CRIMINAL PARTICIPANT WHO ANSWERED TO
               DEFENDANT.........................................14

          4.   SALINAS WAS A CRIMINAL PARTICIPANT IN A CRIME
               ORGANIZED BY DEFENDANT............................15

          5.   SHTOLZBERG WAS A CRIMINAL PARTICIPANT IN A CRIME
               ORGANIZED BY DEFENDANT............................15

          6.   THERE WERE OTHER CRIMINAL PARTICIPANTS IN THE
               CONSPIRACY ORGANIZED AND LED BY DEFENDANT.........16

     E.   DEFENDANT ATTEMPTED TO OBSTRUCT JUSTICE IN MYRIAD WAYS..16

     F.   DEFENDANT DID NOT ACCEPT RESPONSIBILITY.................19

II.  THE 3553(A) FACTORS CALL FOR A SENTENCE ABOVE THE
     GUIDELINE RANGE.............................................20

     A.   DEFENDANT CONTRIBUTED TO THE SUICIDE OF VICTIM ROBERT
          TASCON.................................................21

     B.   DEFENDANT'S DESECRATION OF CHARLES WILDING'S BODY.......22

     C.   HERRLING PLANNED ADDITIONAL FRAUDS......................23

     D.   HERRLING'S "SOBER LIVING" FACILITY WAS ANOTHER FRAUD....25

     E.   DEFENDANT'S COLLECTION OF GHOST GUNS, ASSAULT RIFLES,
          FAKE LAW ENFORCEMENT BADGES, AND A SILENCER SUGGEST
          VIOLENCE...............................................26

i

<u>**TABLE OF CONTENTS (CONTINUED)**</u>

**PAGE**

F.   DEFENDANT'S HISTORY OF DRUG ABUSE WARRANTS DRUG
      TREATMENT AND TESTING, NOT LENIENCY.....................27

G.   A NOMINAL SENTENCE OF 240 MONTHS IN THIS CASE MAY MEAN
      LESS THAN ELEVEN YEARS ACTUALLY IN PRISON .............28

III. CONCLUSION ..............................................30

# TABLE OF AUTHORITIES

**CASES:**                                                                    **PAGE(S)**

U.S. v. Manning,
  704 F.3d 584 (9th Cir. 2012) ................................... 17

U.S. v. Rowland,
  623 Fed.Appx. 343 (9th Cir. 2015) ............................. 17

United States v. Foreman,
  926 F.2d 792 (9th Cir. 1990) ................................... 7

United States v. Hall,
  101 F.3d 1174 (7th Cir. 1996) ............................. 15, 17

United States v. Mara,
  523 F.3d 1036 (9th Cir. 2008) ................................. 20

United States v. Miller,
  588 F.2d 1256 (9th Cir. 1978) .................................. 4

United States v. Monroe,
  943 F.2d 1007 (9th Cir. 1991) .................................. 9

United States v. Reyes-Rivera,
  812 F.3d 79 (1st Cir. 2016) ................................... 21

United States v. Roberson,
  896 F.2d 388 (9th Cir. 1990) ................................... 4

United States v. Santarelli,
  604 Fed.Appx. 164 (3rd Cir. 2015) ............................. 3

United States v. Smith,
  924 F.2d 889 (9th Cir. 1991) ................................... 9

**STATUTES:**

18 U.S.C. § 1001................................................. 20

18 U.S.C. § 2232................................................. 20

18 U.S.C. § 3621(e)(2)(B)........................................ 28

18 U.S.C. § 3624(b)(1)........................................... 28

18 U.S.C. § 3624(g)(1)(A)........................................ 29

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**STATUTES:**                                                          **PAGE(S)**

18 U.S.C. § 3624(g)(3)......................................... 29

18 U.S.C. § 3632(d)(4)(i) & (ii).............................. 29


**SENTENCING GUIDELINES:**

USSG § 2B1.1............................................... 2, 3

USSG § 2B1.1(b)(2)(A)(i)..................................... 3

USSG § 2B1.1(b)(2)(A)(iii)................................... 6

USSG § 3B1.1............................................ 9, 14, 15

USSG § 3B1.1(a)............................................. 9

USSG § 3B1.3............................................... 7

USSG § 3C1.1........................................ 17, 18, 19

USSG § 3E1.1.............................................. 19

USSG § 5H1.4.............................................. 28

USSG § 5K2.1........................................... 22, 25

**I.   PROBATION CORRECTLY CALCULATED DEFENDANT'S GUIDELINE RANGE**

The government concurs in the findings and recommendation of the Presentence Report ("PSR").

On September 6, 2023, defendant objected by email to most of the guideline calculations of the Probation Office.  Below, the government responds to defendant's emailed objections:

**A.   THE +18 LOSS ENHANCEMENT WAS CALCULATED CONSERVATIVELY**

The Probation Office conservatively determined that "Herrling is responsible for a total loss of $3,887,051."  (PSR ¶ 71(c).) Defendant did not dispute the loss amounts for the Wilding estate ($447,051) or the Tascon property ($1.5 million), but argued that there should be no loss at all for the Lowenstein estate ($1,940,000):

> The Lowenstein residence was sold in a public auction sale by the court appointed public administrator for the Lowenstein estate. The funds from the sale continue to be held by the Public Administrator until a final accounting is completed by the probate court.  The property was sold for above market value without any fraud or concealment. Defendant's alleged fraudulent conduct with the Lowenstein estate had absolutely no effect in the legal and lawful sale of the Lowenstein residence. The sale was sanctioned by an independent public administrator and approved by the Court. The $1,940,000 should not be considered in the loss calculation. Accordingly, the loss is more than $1,500[,000] but less than $3,500[,000] and should be a 16-level increase as opposed to an 18-level increase as referenced in the pre-sentence report.

While defendant does not concede that her attempted takeover of the Lowenstein estate was fraudulent ("Defendant's *alleged* fraudulent conduct . . ."), that does not seem to be the gravamen of her objection.  Instead it appears to be that Lowenstein's residence was sold for a fair price, and that the "funds from [its] sale continue to be held by the Public Administrator. . . ."  In short,

1

defendant argues that because she was arrested before she was able to gain control of the Lowenstein property sale proceeds, she should not be punished for attempting to steal them.

Defendant appears to be confused by the difference between "actual loss" and "intended loss."  Defendant is correct that because her efforts to steal the Lowenstein estate were frustrated, there ultimately may be little in actual losses associated with it.[1] But the guidelines reasonably hold defendants accountable not only for what they succeed in doing, but also for what they attempt to do.

The Guidelines provide that "loss is the *greater* of actual loss or intended loss."  USSG § 2B1.1, app. note 3(A) (emphasis added). "Intended loss," in turn, "means the pecuniary [i.e., monetary] harm that the defendant purposely sought to inflict."  USSG § 2B1.1, app. note 3(A)(ii).  Here, by forging a will that left the Lowenstein estate to Charles Wilding—whose identity defendant controlled through a forged power of attorney form—defendant clearly intended to steal the full value of the estate, and would have done so if her fraud had not been detected.  (PSR ¶¶ 38-41.)  Accordingly, even if the Lowenstein estate later recovers the $1,940,000 in proceeds from the sale of the residence, defendant would still be responsible for that figure as intended loss.

_____

[1] Currently the Lowenstein estate has been deprived of its real property, and has not yet received any proceeds from its sale because the forged will defendant submitted has halted the legitimate distribution of the proceeds.  It is to be hoped that eventually the proceeds will be distributed to the rightful heirs, and that the estate will merely be out of pocket the accounting and legal fees necessary to straighten out defendant's fraud, as well as the cost of the art and other collectibles defendant and her conspirators stole from the estate.

2

**B.   THERE WERE MORE THAN 10 VICTIMS**

Defendant contends that the Probation Office erred in finding that there were at least 10 victims of the fraud, triggering a two-level enhancement under Section 2B1.1(b)(2)(A)(i).  (PSR ¶ 71(f)-(h).)   In cases involving identity theft, such as this one, the guidelines define "victim" in two ways, either one of which is sufficient.  First, the term "victim" includes "any person who sustained any part of the actual loss," where "person" includes "individuals, corporations, companies, associations, firms, partnerships [etc.]."  USSG § 2B1.1, app. note 1, definitions. Second, only in cases involving "means of identification," e.g. identity theft, "victim" also includes "any individual whose means of identification was used unlawfully or without authority."  USSG § 2B1.1, app. note 4(E).  Third, in cases where a decedent's estate has been victimized, the heirs who should have received the estate count as victims, too.  See, United States v. Santarelli, 604 Fed.Appx. 164, 169 (3rd Cir. 2015) (rejecting defendant's claim that "the only victim is Striminsky's estate" and affirming the district court's counting as victims all "the beneficiaries in the will" who received nothing due to the fraud, and who numbered more than 10).

Here, the Probation Office identified 21 individuals whose identities were used without authority, far exceeding the 10 necessary for the enhancement.  (PSR ¶ 71(g).)  Defendant speculates that some of the identities which were recovered from her residence might have belonged to others "since the house was used as a sober living location where multiple people resided," and complains that how these identities were used was not always clear from the PSR. But the PSR is not supposed to include evidentiary detail on each

identity; it is meant as a summary for the Court.  If defendant contends that there were fewer than 10 victims, it is incumbent upon her to offer evidence to support her position, not merely to be obstructionist and claim that the PSR should have provided more details.

> Rule 32[] imposes certain requirements upon the defendant . . . . [including] that where factual inaccuracy [in the PSR] is alleged, the defendant has the burden of introducing, or at least proffering, evidence to show the inaccuracy.

United States v. Roberson, 896 F.2d 388, 391 (9th Cir. 1990) (rejecting defendant's claim that the district court failed to resolve disputed facts when defendant "failed to proffer or to present . . . a factual scenario at odds with that set forth in the pre-sentence report").  See also, United States v. Miller, 588 F.2d 1256, 1266-7 (9th Cir. 1978) (affirming the district court's adoption of the presentence report when defendant's objections consisted only of "his counsel's bare assertion . . . that the information [in the presentence report] is incorrect"):

> When a defendant has within his capacity the means to dispute the information presented by the government to the probation officer conducting a presentence investigation and chooses to remain silent, he cannot demand that the trial court disregard the government's version of the facts.

Regardless, just the complaint that defendant received makes clear that the conspiracy involved the use of the identities of more than 10 persons, some of which are listed below:

Undisputed Victims Whose Identities Defendant Stole

1.   June Wilding

2.   Charles Wilding

3.    Robert Tascon

4.    Jackie Shields Lowenstein

Lawyers/Notaries in the Complaint Whose Identities Defendant Forged

5.    Abraham Kanaan (Comp. Aff. ¶ 54-55)

6.    Hamid Soleimanian (Comp. Aff. ¶ 56-59)

7.    Behrooz Yasharel (Comp. Aff. ¶ 23)

8.    Melvin Kreger (Compl. Aff. ¶ 38)

Heirs Who Lost Their Inheritance

9.    Miracle Williams (Exh. page 9: beneficiary of Robert Tascon will)

10.   Lawrence Eckert (Versoza Decl. ¶ 6 and Exh. page 7: Wilding heir)

11.   Pamela Sokol (same)

12.   Susan Smith (same)

13.   Christine Nealy (Versoza Decl. ¶ 7, Jackie Lowenstein heir who suffered the theft of her collectibles and other personal property)

Companies That Sustained Losses

14.   Wells Fargo Bank (defrauded by post-death charges on Charles Wilding credit card, see Compl. Aff. ¶ 49)

15.   Citibank (same)

16.   Fidelity National Title Insurance Company (spent $613,678.18 resolving lawsuit over policy for Robert Tascon property, exh. pages 5-6.)

Additional Victims Whose Identities Defendant Used:

17.   Jocelyn Korchak (Versoza Decl. ¶ 8, individual whose identity was misused as a purported witness on the forged Lowenstein will)

Finally, the same +2 enhancement under Section 2B1.1(b)(2)(A) applies in another way as well because it also "resulted in substantial financial hardship to one or more victims." USSG § 2B1.1(b)(2)(A)(iii).  As described in more detail below, defendant stole Robert Tascon's house, his last significant asset, which precipitated his suicide.  It is hard to imagine a clearer example of "substantial financial hardship."

### C.   DEFENDANT ABUSED A POSITION OF TRUST

The Probation Office determined that defendant abused a position of trust in two separate ways, either one of which would be sufficient to trigger the enhancement under Section 3B1.3.  First, she forged a power of attorney form that gave her the discretion to dispose of Charles Wilding's assets in any way she saw fit.  Second, she pretended to be an actual attorney in order to sell the real property belonging to Robert Tascon.  (PSR ¶¶ 74-80.)

Defendant does not dispute the facts upon which the Probation Office relied, but argues that the enhancement only applies if Charles Wilding or Robert Tascon personally were deceived by defendant:

> Defendant never made representations to the alleged victims themselves, nor provided any indicia to the victims that she legitimately held a position of trust in order to fool the alleged victims, June Wilding, Charles Wilding, Robert Tascon and Jackie Lowenstein. Defendant was never legitimately put in any position of trust by the alleged victims. A victim must know what the defendant is doing and trust the defendant.

Defendant offers no support for her position, which is inconsistent with the plain language of Section 3B1.3.

That enhancement states, "If the defendant abused a position of public or private trust . . . in a manner that significantly

6

facilitated the commission or concealment of the offense, increase by 2 levels." USSG § 3B1.3. Nothing in this language requires that the "victim must know what the defendant is doing and trust the defendant," as defendant asserted without authority. Indeed, defendant's claim has been implicitly rejected by the Ninth Circuit in United States v. Foreman, 926 F.2d 792, 796 (9th Cir. 1990). In that case, Foreman was smuggling cocaine hidden beneath her clothes through LAX when DEA agents stopped her for acting suspiciously. Foreman was a sworn police officer who attempted to deflect the agents' suspicion by showing them her badge, which the district court found warranted the abuse of position of trust enhancement. On appeal, Foreman argued that Section "3B1.3 is . . . inapplicable to her because she did not abuse any special privilege accorded her as a police officer by showing her badge and police identification to the investigating officers." The Ninth Circuit rejected this argument:

> We find no merit in this argument. Notwithstanding that having a police badge itself may be a special privilege, the adjustment in § 3B1.3 is for "abuse of a position of trust." The guideline does not expressly limit such abuse to special privileges accorded to one with a position of trust, nor do we believe that such a limitation can be inferred. More specifically, police officers are accorded public trust to enforce the law. The public, including fellow law enforcement agents, expect that police officers will not violate the laws they are charged with enforcing. Foreman took advantage of that trust to make it easier for her to conceal criminal activity. We believe that this is precisely the type of situation contemplated by § 3B1.3 as an abuse of position of public trust.

(Id.) Foreman undercuts defendant's argument in at least two ways. First, it rejects reading into Section 3B1.3 requirements that are not found in its text, as defendant asks this Court to do. Second, it is plainly inconsistent with defendant's claim that the "victim

7

must know what the defendant is doing and trust the defendant."
There were no identifiable victims in <u>Foreman</u>, and no one knew what
Foreman was doing.

It is common knowledge that an attorney has a fiduciary duty to
her client, and must act at all times in the best interest of her
client. Here, defendant took advantage of that understanding when,
purporting to be "Carrie Phenix" the attorney for victim Robert
Tascon, she negotiated the cut-rate sale of real property on behalf
of her absent client. Those involved in the purchase would
naturally have scrutinized the transaction if it were not for the
fact that defendant, posing as Robert Tascon's lawyer, lulled them
into thinking it was legitimate by her purported legal training,
professionalism, and duty to her client. Otherwise, the purchaser,
broker, and escrow company would have wondered: (1) Why was Robert
Tascon absent? (2) Why was he willing to accept such a low price?
(3) Why was it imperative that the deal close so quickly? (4) Why
did Robert Tascon want the bulk of the proceeds from the sale wired
to an account held by Caroline Herrling and Jason Kroth? It is
scarcely believable that the fraud could have been completed without
the reassuring presence of Robert Tascon's "lawyer," "Carrie
Phenix," who answered these questions and occupied a position of
both public trust (as a lawyer) and private trust (as a fiduciary to
Robert Tascon).

### D. DEFENDANT WAS AN ORGANIZER AND LEADER OF AT LEAST FOUR OTHER PARTICIPANTS

Here, the Probation Office found that defendant was the
organizer and leader of six different persons (PSR ¶ 84), two more
than is necessary to support the four-level enhancement under

Section 3B1.1(a).  In her emailed objections, defendant claimed she "was not a leader or organizer" and that instead "Jason Kroth and James Kantor asserted control over the defendant."  Defendant offered no evidence to support her assertions.

### 1.   Defendant directed the activities of Kroth

The only specific allegation defendant made in her emailed objections was that "Kroth hired a person by the name of Payton to act as Wilding."  The government agrees with defendant that Kroth had a supervisory position over Payton, but that in no way helps defendant.  First, as the leader and organizer of the conspiracy, defendant can be held responsible for the actions of Payton even though Kroth was his immediate supervisor:

> [Section] 3B1.1(a) does not require a defendant to personally supervise each participant. The section simply states that an adjustment occurs if a defendant was an "organizer or leader of a criminal activity that *involved* five or more participants...."

United States v. Smith, 924 F.2d 889, 896 (9th Cir. 1991) (emphasis in original).  Second, even assuming for the sake of argument that Kroth was defendant's equal in the conspiracy, that would not prevent her from receiving the four-level role enhancement.  "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  USSG § 3B1.1, app. note 4.  Cf., United States v. Monroe, 943 F.2d 1007, 1019 (9th Cir. 1991) (affirming organizer and leader enhancement for Monroe: "The fact that Bender and McCabe played a leadership role in the initial phases of the conspiracy is not dispositive. The guidelines commentary notes that there can be more than one leader or organizer.")

Defendant and Kroth may have started the conspiracy as partners.  They were romantically involved.  And both were essential to the success of the scheme.  Kroth discovered victim Charles Wilding, and saw the potential for a big score.  But he knew that only defendant could make it a reality, and it was she who guided the conspiracy to the success that it had.  Their communications show that defendant was organized, competent, and got things done-- often through others--while Kroth was unreliable and over time was marginalized in their conspiracy.

In an early text exchange, Kroth asked defendant "what's going on with the check and the other thing that came in the mail?", and defendant brusquely told him off:

> I told you there can't be anymore distributions until the Heggstad Petition is granted.  That hearing is now on April 26th.

> I totally risked it giving out even the last distribution bc ultimately I'm legally responsible for it and will personally [be] held accountable for it if the court were to order an accounting for the estate.  The risk is significantly reduced if the Heggstad petition is granted.

Kroth meekly replied "Ok".  (Versoza Decl. ¶ 2.)

In another exchange that defendant saved as a screenshot on her phone, Kroth praised defendant's competence and role in the scheme, but reminded her that the scheme started with his finding the victim, so Kroth should not be forgotten:

> And yeah your role has gotten bigger and bigger and all this you're taking on more and more of a role and responsibility and stepped up [to] the plate and to be honest with you I am amazed at you but it should never diminish what started this [i.e., that Kroth found the perfect victim in Charles Wilding]

Ultimately, defendant lost patience with Kroth both personally and as a co-conspirator:

I decided my New Years resolution after you completely
blew me off and didn't come back to help me [dispose of
Wilding's body] like you said you would causing me to miss
the fireworks and left to spend NYE alone.  For 3 days not
a single word from the person who not only claims to care
about me but also made a commitment in return for
significant financial gain [a share of the fraud
proceeds].  This was just the icing on the cake made with
a batter of lies and let downs.  You requested support
without putting any effort in return.  I wasn't asking you
to love me just be honest with me.  I literally handed you
the ability to forever change your life in a way most can
only dream about [i.e., hundreds of thousands of dollars
from their fraud] yet you don't even bother giving me the
most basic respect.

I'm done.

(Versoza Decl. ¶ 2.)

Defendant decided to minimize Kroth's role in the conspiracy

and to use instead her own team of more competent co-conspirators:

Just so you know, I'm not trying to change you so in the
future please know that there is nothing you need to do.
it easier for me to just handle it with my team of people-
Hadley [defendant's assistant], Good James, Randy &
Jonathan [Wilkins, who supplied the sailboat to dispose of
Mr. Wilding's remains] than constantly have to chase after
you or not being able to rely on it getting done.  This
doesn't mean I'm excluding you or think you are a bad
person.  Obviously, I hold a special place in my heart for
you but I just need things to be reliable and efficient or
shit doesn't get done and money isn't [sic: is] wasted.  I
hope you understand.

(Versoza Decl. ¶ 2.)

### 2.   Defendant directed the activities of Kantor

Defendant claims that James Kantor actually told her what to

do, not the other way around:

James Kantor was the person who created all the legal
documents used in the fraud. It was James Kantor who
instructed defendant as to the entire process for filing
estate documents and gave her instructions about hiding
Wilding's body.

It is true that Kantor, through his years of litigation over

wills and estates with his own family, had a greater knowledge

11

of the related legal documents than did defendant.  But arguing

that that made him the leader, and defendant the subordinate,

is absurd.  It is akin to arguing that a methamphetamine cook

ranks higher than the drug lord who employs him because the

methamphetamine cook tells the drug lord what chemicals he

needs to buy.

Here, there are myriad examples that show that defendant

was in control, and Kantor a subordinate who brought some

technical skill to the conspiracy.  Often they fought about

money, with defendant first threatening to cut Kantor's share

of the fraud proceeds:

> HERRLING: Btw, your little shit-fit departure today was
> witnessed by the neighbor lady and her 2 toddlers.
> Definitely not a good look and puts things at risk **so be
> professional if you expect to be paid like a professional**
> and stop fucking with my life.
>
> KANTOR: Are you threatening to not pay me? Oh hell no.
>
> HERRLING: That's not what I was doing
>
> KANTOR: You better think twice with that forged document
> in court..

(Versoza Decl. ¶ 2, emphasis added.)

Later, defendant explicitly cut Kantor's share of the fraud

proceeds, which caused him to threaten to call the police in a

failed attempt at blackmail.  (It failed because defendant's

assistant recorded a call Kantor made threatening blackmail, and

then sent Kantor the recording, making clear that if the police were

involved, Kantor would be a defendant, too.)  In the following

exchange, Kantor argues that it is unfair for defendant to cut his

compensation after he has already made the fraudulent documents, and

defendant explains that Kantor did not help her dismember the body of Charles Wilding, so failed to live up to her expectations:

KANTOR     [You] Tried to change the amount of my compensation in the middle [of the fraud].

HERRLING   James, You didn't do the shit that you were supposed to do.

KANTOR     So that doesn't need to change my compensation deal like that.

HERRLING   There is no deal, but it required you to do something [help dispose of Wilding's body] to get a third.

KANTOR     No.

HERRLING   Yes, it did.

(Versoza Decl. ¶ 2.)

While defendant's control over Kantor is implicit in her cutting his share of the proceeds, Kantor actually made it explicit when he called her a "bad leader":

HERRLING   I'm not threatening either one of you. I'm just saying that to say.

KANTOR     That we don't deserve our compensation. **Not only are you being a bad leader** and a bad partner, but you're threatening us. That's considered threatening because you have the right to do it.

HERRLING   Well, when I have to go do the job because it doesn't get done.

KANTOR     What you what I make you nothing of what I need, what I'm doing. So how is it that you have to go do the job?

| | | |
|---|---|---|
| HERRLING | There was many jobs that I had to go do. | |
| KANTOR | Because I didn't do them. | |
| HERRLING | There was one particular [job] that we keep passing over [i.e., dismembering Charles Wilding]. | |
| KANTOR | Me having to come back to do it with you. You said, No. [Kantor offered to help defendant, but only after he had already returned to Georgia and so could not do so quickly] | |
| HERRLING | I waited for you to do it with me. We were both here. You were here in town for two weeks. | |
| KANTOR | I was waiting and it wasn't happening. | |
| HERRLING | But it doesn't happen when you don't make it happen because you were supposed to make it happen. | |
| KANTOR | I was ready. | |

(Versoza Decl. ¶ 2, emphasis added.)

> 3. **Wilkins was a criminal participant who answered to defendant**

Defendant argued in her emailed objections that "Wilkins was not a co-conspirator" because he did not act "with the requisite intent to commit wire or mail fraud." But Section 3B1.1 does not require that Wilkins have participated in the conspiracy from the beginning through the end. It is not disputed that Wilkins used his sailboat to transport defendant, her assistant, and the remains of Charles Wilding away from the shore so that defendant could dispose of his chopped up body where it would never be found. (PSR ¶¶ 34-35, 84(d).) That is enough for Wilkins to come within the Guidelines definition of a "participant" in the offense:

> [J]ust as a party who knowingly assists a criminal
> enterprise is criminally responsible under principles of
> accessory liability, a party who gives knowing aid in some
> part of the criminal enterprise is a "criminally
> responsible" participant under [Section 3B1.1 of] the
> Guidelines.

United States v. Hall, 101 F.3d 1174, 1178 (7th Cir. 1996)

(collecting cases holding the same from other circuits).  Further,

defendant arranged to pay Wilkins for his help.  (Versoza Decl. ¶¶

2, and 4.)

### 4.   Salinas was a criminal participant in a crime organized by defendant

In her emailed objections, defendant asserts that "Kenneth

Salinas was not controlled or supervised by the defendant" and that

"it was Jason Kroth who provided Salinas with a script to use if the

police came to his house and asked about Mr. Wilding."  Defendant

has offered no evidence to support her assertion that Jason Kroth

provided Mr. Salinas with a script to follow in talking to the

police to make it appear that Charles Wilding was alive and well on

vacation, and supported defendant's disposition of his assets.  But

it would not matter if Kroth had.  Defendant personally paid Salinas

$5,000 to misdirect the police (Compl. Aff. ¶ 17-18, and PSR ¶

84(e)), which is more than enough to show that he was one of her

subordinates.

### 5.   Shtolzberg was a criminal participant in a crime organized by defendant

Defendant asserts without evidence in her emailed objections

that "Samuel Shotlzberg [sic] is not a participant in the charged

criminal activity," and so cannot support her leader and organizer

enhancement.  Shtolzberg was defendant's live-in boyfriend, and a

participant in her scheme.  Indeed, the counterfeit identity

15

documents used to deceive the notary into believing that the imposter was actually Robert Tascon were found on Shtolzberg's phone.  (PSR ¶¶ 66, 84(f), Compl. Aff. ¶ 72.)  Further, defendant asked Shtolzberg to help her obstruct justice by getting her home put into another person's name to avoid forfeiture, and falsely implicating Kroth for the counterfeit Robert Tascon identification.  (PSR ¶¶ 66, 67, 97.)

> 6.   There were other criminal participants in the conspiracy organized and led by defendant

While we do not know his name, defendant arranged to have an imposter pretend to be Robert Tascon before the notary who notarized defendant's "power of attorney" form for Tascon.  (Compl. Aff. ¶ 72.)  The photograph on the counterfeit identity document makes clear that the imposter was not any of defendant's subordinates that were already discussed.

Moreover, defendant herself texted Kroth that because he was unreliable, she would rely on her own team rather than Kroth, and listed as her team members two persons not counted among her subordinates, namely "Randy" and "Good James":

> . . . it easier for me to just handle it with my team of people-Hadley, Good James, Randy & Jonathan than constantly have to chase after you or not being able to rely on it getting done. . . .

(Versoza Decl. ¶ 2.)

**E.   DEFENDANT ATTEMPTED TO OBSTRUCT JUSTICE IN MYRIAD WAYS**

The Probation Office found that defendant "obstructed or impeded, or attempted to obstruct or impede, the administration of justice in a number of ways."  (PSR ¶ 60.)  Indeed, defendant did so in several ways, each of which was sufficient independently to warrant the enhancement.

First, defendant "called Samuel Shtolzberg (Shtolzberg) and suggested that Shtolzberg [falsely] tell law enforcement that the fake Tascon I.D. that was found in his possession was obtained from Kroth." (PSR ¶ 66.) Defendant knew this was false because the "I.D. was actually obtained at the direction of Herrling." (Id.) Attempting to get a witness to falsely implicate another, of course, constitutes obstruction of justice. USSG § 3C1.1, app. note 4(A) (the obstruction enhancement applies to "unlawfully influencing a co-defendant, witness . . . or attempting to do so.")

Second, when law enforcement was investigating the disappearance of Wilding, defendant purchased a burner phone which she falsely claimed to law enforcement and the courts was Wilding's, in order to bolster her lie that he was alive and gave her power of attorney to manage his affairs. (Complaint Aff. ¶ 14 and 20; PSR ¶ 61.) She also "hired and paid individuals to pretend to be Wilding" or to have seen him "to hide the fact that Wilding was in fact dead, so that she could continue to steal funds from him and his estate." (PSR ¶ 61.) The Ninth Circuit has repeatedly held that concocting false stories to mislead investigators supports an obstruction of justice enhancement. See, U.S. v. Rowland, 623 Fed.Appx. 343 (9th Cir. 2015) (affirming obstruction of justice enhancement when "Rowland falsely told law enforcement that, on the night that the victim was last seen alive, Rowland witnessed the victim depart in a vehicle with an unknown male."); U.S. v. Manning, 704 F.3d 584, 587 (9th Cir. 2012) ("concoct[ing] a story" may be treated as an obstruction of justice).

Further, she "instructed her co-participants to destroy the scene of Wilding's death, including repairing the walls and removing

17

the floorboards in order to hide any traces of Wilding's death."

(PSR ¶ 62.)  Most disturbingly:

> Herrling also removed Wilding's body from his home and
> attempted to dissolve it in a vat of acid. After that did
> not work, she then dismembered his body and took it to the
> San Francisco Bay to be disposed of.

(PSR ¶ 62.)  Both creating false evidence (such as the burner phone) and destroying actual evidence warrant the obstruction enhancement. USSG § 3C1.1, app. note 4(C) and (D).

Defendant asserts that none of these actions was even an attempt to obstruct justice.  Defendant attempts to reframe the findings of the Probation Office as though they were based merely on her denying to law enforcement that she committed the crime:

> Defendant submits the recommended adjustment for
> obstruction of justice should not include conduct which is
> the gravamen of the wire fraud conspiracy. Defendant's
> failure to advise police of Wilding's death, would result
> in a violation of her right to remain silent and is a
> noted limitation referenced in Application Note 2 to USSG
> §3C1.1.

But no one ever argued that defendant was obliged to turn herself in to the police, or to truthfully admit her crime when she was interviewed.  Such conduct does not trigger the obstruction of justice enhancement.  USSG § 3C1.1, app. note 2 ("A defendant's denial of guilt . . . is not a basis for application of this provision").  Paying witnesses to pretend to have seen Wilding, or even to pretend to be him, however, does.  USSG § 3C1.1, app. note 4(A) (enhancement applies to "unlawfully influencing a . . . witness").

The reason this case was initiated by LAPD Homicide is that Charles Wilding had disappeared, and defendant was trying to conceal that fact.  If not for defendant's obstructive conduct, an autopsy

could have revealed whether Wilding was murdered or died of natural causes.  Similarly, a forensic examination of his purported death scene might also have done so.  But defendant made that impossible when she spared no effort in eradicating Charles Wilding and any evidence of his death, removing even the floorboards of his bedroom where he likely died.  (PSR ¶ 62).  The Guidelines provide that merely shredding material documents triggers the obstruction enhancement.  USSG § 3C1.1, app. note 4(D) (enhancement applies to "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence)".)  Attempting to dissolve Wilding, and then cutting him up and dumping him in the bay, is so much worse, and so much more obstructive.

### F.  DEFENDANT DID NOT ACCEPT RESPONSIBILITY

The Probation Office found that defendant did not accept responsibility for her offense.  To be sure, defendant waived preliminary hearing and indictment, and promptly pled guilty.  There is no question but that defendant would have received the full three-level reduction under Section 3E1.1 if she had not demonstrated through her actions that she did not accept responsibility at all.  But that is precisely what she did.

Defendant applied over $400,000 of the proceeds she stole from selling Robert Tascon's home to a downpayment on the purchase of her Woodlake residence (Complaint Aff. ¶ 75.), making it subject to forfeiture.  Indeed, defendant's plea agreement expressly provides for the forfeiture of that residence.  (Plea Agreement 3.)   Yet

defendant planned to prevent the forfeiture of her residence, the proceeds of which would have been applied to restitution, by transferring title to a loved one:

> Herrling's calls while in custody include conversations where she discusses putting the residence in her parent's name, Shotlzberg's parents name, or any other individual. Herrling then acted on this plan and even asked her mother if she would be willing to assume title of the Woodlake Residence.

(PSR ¶ 97.)   Transferring property for the purpose of preventing the government from forfeiting it is a felony, 18 U.S.C. § 2232.

Further, defendant asked one of her co-conspirators to lie to the authorities and falsely implicate a different co-conspirator (PSR ¶ 66), which constitutes soliciting a false statement in violation of 18 U.S.C. § 1001.   Criminal conduct during the pendency of sentencing justifies a denial of acceptance of responsibility even when the new criminal conduct is unrelated to offense of conviction.   See United States v. Mara, 523 F.3d 1036, 1037 (9th Cir. 2008) (affirming district court's denial of acceptance of responsibility where defendant who pled guilty to being a felon in possession of a firearm engaged in an unrelated jailhouse fight before sentencing).

## II. THE 3553(A) FACTORS CALL FOR A SENTENCE ABOVE THE GUIDELINE RANGE

While some of what makes this crime egregious has been captured by the guidelines, the following factors have not.   They would militate for an above-guideline range sentence, but that is impossible here as defendant's sentencing range is already bounded by the statutory maximum sentence, 240 months in prison. Accordingly, they justify the longest sentence the Court can impose: twenty years in prison.

**A.   DEFENDANT CONTRIBUTED TO THE SUICIDE OF VICTIM ROBERT TASCON**

Defendant's victim Robert Tascon committed suicide after defendant fraudulently sold his residence.  (Complaint Aff. ¶ 69; PSR ¶ 47).  Identity theft is a devastating crime, and stripping a troubled man of his primary asset could push him over the edge, as it appears to have done for Mr. Tascon.  Travis Hartgraves, the case manager at the law firm that represented Mr. Tascon in the lawsuit over the fraudulent sale of Mr. Tascon's house, befriended Mr. Tascon, and explained:

> . . . . Mr. Tascon believed there was a long-term plan to fraudulently sell the property.  The house was the last thing and asset he had to his name (although he still had monthly payments from the trusts). Mr. Hartgraves said, "The fraudulent sale just about crashed him."  The only time he was left alone by Ms. Williams and her father, he committed suicide.
>
> Mr. Hartgraves, who had extensive involvement in the discovery process for the lawsuits, observed Mr. Tascon's fluctuating emotional state.  Mr. Hartgraves said that Mr. Tascon would be in a good mood, then down in the dumps.  Mr. Tascon told him that "I am never going to get my house back." The fraudulent sale of his home was the final straw; it consumed him.  The lawsuit was more than he could deal with.  Mr. Tascon did not know the people listed in the fraudulent sale of his house, like Janice Yeh and Jason Kroth.  Mr. Tascon left a will bequeathing his assets to Ms. [Miracle] Williams, however with the fraudulent sale of the Encino home, he had nothing left to leave Ms. Williams.
>
> Mr. Hartgraves law firm were engaged in a legal battle against the buyer of the Encino home; however, after Mr. Tascon's death, they did not have any funding to continue the legal fight.  Mr. Hartgraves firm negotiated a small settlement for Mr. Tascon's estate.

(Exh. page 9.)

Courts have upheld upward departures even when the victims' suicide attempts were unsuccessful.  E.g., United States v. Reyes-Rivera, 812 F.3d 79, 91 (1st Cir. 2016) (affirming upward departure

21

when "[s]ome of the [defendant's fraud victims] have attempted suicide" even though none succeeded).  The sentencing guidelines themselves suggest that where a crime results in death, an upward departure to near the statutory maximum would often be appropriate, but not "automatic[]."  Cf. USSG § 5K2.1 ("If death resulted, the court may increase the sentence above the authorized guideline range.  Loss of life does not automatically suggest a sentence at or near the statutory maximum.").  Here, defendant's guideline sentencing range is so much higher than the statutory maximum, that it would take a *downward* departure to bring it in line with a 240-month sentence, showing that no sentence short of the statutory maximum would be appropriate here.

**B.   DEFENDANT'S DESECRATION OF CHARLES WILDING'S BODY**

The Probation Office properly highlighted in its recommendation letter defendant's desecration of the body of Charles Wilding:

> This offense involved Herrling breaking into the home of an individual, and letting their corpse rot in the home, while Herrling assumed his identity and stole his family's assets. When the corpse became an inconvenience to her and could possibly lead to the detection of her unlawful actions, Herrling desecrated the corpse by first trying to dissolve it in a vat of lye, and when that did not work, she violently dismembered the corpse, and scattered the parts across the San Francisco Bay. Despite engaging in such heinous actions, Herrling was posing and taking selfies with her assistant, and posting the photos on Instagram as they were scattering the dismembered body parts of their victim, showing a complete lack of reverence for their actions.

(PSR Recommendation Letter, dkt. 36, page 7.)

Defendant may argue that the desecration, while grisly, was intended only to hide the fact of Charles Wilding's death, and was therefore similar to the steps criminals often take to keep their crimes unsolved.

22

But such an argument fails to consider what the desecration says about defendant's character.  Defendant's co-conspirators, some of whom had been to prison repeatedly, did not help defendant hack apart Mr. Wilding's body, a fact she often reminded them of to justify keeping the lion's share of the fraud proceeds for herself.

It was defendant who purchased the corpse smell deodorizer, cadaver bag, gloves, and toxic chemicals in hopes of liquefying Mr. Wilding's body.  (PSR ¶¶ 31, 36.)  And it was she who turned dumping his remains in the San Francisco Bay into a mini-vacation complete with renting a muscle car for the ride north, smiling photographs of defendant on the sailboat used to dispose of Mr. Wilding's pieces (Exh. page 4), and an extravagant return to Los Angeles by private jet.  (PSR ¶¶ 33, 34, 37.)  By all outward appearances, defendant was enjoying herself and the fruits of her fraud.  It takes an exceptionally ruthless person to turn the disposal of a victim of identity theft into a celebration.

### C.   HERRLING PLANNED ADDITIONAL FRAUDS

While the fraud she orchestrated was large, long lasting, and very profitable, defendant planned additional frauds, too, suggesting a great likelihood of recidivism, far in excess of that predicted by her Criminal History Category of I.  Indeed, she saw the frauds she committed against the Wildings, the Lowensteins, and Robert Tascon as templates to be used against additional victims, too.

Defendant brought her intelligence and customary organization to the task of finding more victims.  In her home law enforcement found:

> digital spreadsheets that contained tabs with titles such as "Heir Index", "Heirs Name", and "Current Balance", as well as tabs containing property ID numbers. Searches of Herrling's digital devices revealed online searches for "millionaire" and "Obituary".

(PSR ¶ 54.)  She also tasked her subordinates with finding more victims without heirs so that no one was likely to contest her looting of their estates:

> Found a perfect match in Denver. Died suddenly in February, no heirs, owned property. It's still in her name. [Intended victim's name and address redacted].

(Versoza Decl. ¶ 2; text message from Kantor to defendant).

Defendant cast a broad net to identify potential victims.  On her phone, she took screen captures of Google satellite view of affluent areas and marked with a pin homes with algae-filled swimming pools.  This identified valuable real estate that had fallen into disuse, and therefore was vulnerable to a takeover of the kind she did with Charles Wilding's property.  (Versoza Decl. ¶ 5.)

Defendant's plans for victimizing more persons were in some cases far along.  Her ipad contained additional fake wills in the names of "Ritsuko Nakamura Wilson" and "Mary Held."  Further, defendant's phone showed she had been researching the LA County Coroner's website, presumably to locate recently deceased persons with sufficient assets to make her fraud worthwhile.

It is doubtful that the government has identified all of defendant's actual and intended victims, but it is certain that defendant would have victimized many more persons had she not been arrested.  Defendant's plans to continue victimizing others would warrant an upward variance if it were possible in this case, but a sentence at the statutory maximum since it is not.

### D.   HERRLING'S "SOBER LIVING" FACILITY WAS ANOTHER FRAUD

Defendant attempts to portray her use of her residence as a sober living facility as an act of altruism.  She claims that she was motivated to start it by her "passion for helping people" (PSR ¶ 126), not her desire for compensation.  But the facts are to the contrary.

First, defendant was able to purchase the West Hills property she used as a sober living facility only because she fraudulently sold Robert Tascon's property without his consent—and used over $400,000 from that theft as a downpayment for West Hills.  (PSR ¶¶ 45-46).

Second, it is absurd to call defendant's West Hills property a sober living facility.  To be sure, she billed for the services of a sober living facility, but she did not provide them.  Instead, as defendant candidly admitted, she herself was almost always high on methamphetamine. (PSR ¶ 125:  "Herrling reported that in the last 26 years, she has only been sober for approximately 77 days," or about three days per year).  Her boyfriend and partner in the purported sober living facility was a heroin addict (id.) who kept a gun and distribution quantities of narcotics there.  Indeed, as discussed below, defendant personally kept many loaded and untraceable ghost guns in her "sober living facility," along with a variety of hard drugs (PSR ¶¶ 50-52), showing that it was just another way for her to bilk the system while using it as the headquarters for her own criminal schemes.

**E.   DEFENDANT'S COLLECTION OF GHOST GUNS, ASSAULT RIFLES, FAKE LAW ENFORCEMENT BADGES, AND A SILENCER SUGGEST VIOLENCE**

Defendant's guideline range of 240 months in prison is based solely on the fraud she committed, and the financial danger she presents to the community.  But the evidence recovered from her home, combined with her proven ability to make bodies disappear, suggest she also presents a more menacing physical danger to the community.

Defendant possessed a variety of firearms, and multiple counterfeit or stolen law enforcement badges, and a fake FBI ID card bearing her photograph.  (PSR ¶ 101.)  In total, there were 16 firearms in her house.  (PSR ¶ 52.)  Just affixed to the back of her bedroom closet door were nine firearms, including assault rifles and shotguns.  (Exh. page 1.)  Some of the weapons were untraceable "ghost" guns without serial numbers.  Many were loaded, including the pistol defendant kept in her purse.  She had a ghost pistol beside her bed and another one in a secret stash that required magnets to open.  Defendant admitted that she had some guns. (Complaint Aff. ¶¶ 92-96).  Defendant's possession of so many loaded and untraceable firearms is particularly troubling because she had counterfeit badges for the DEA, U.S. Diplomatic Security Service, and Beverly Hills Police Department, suggesting that she passed herself off as law enforcement.  (Exh. page 2).  Defendant also possessed a silencer for a firearm made out of an oil filter.  (PSR ¶ 101.)  Defendant's involvement with drugs, including her use of methamphetamine, further suggests that her strewing loaded and unlocked firearms throughout her home was for a criminal purpose and, in any event, was extremely dangerous.  Additionally she

possessed actual, blank government Non-Disclosure Agreements labelled Top Secret.  Given her fake badges and FBI card, Herrling could have used the Top Secret NDAs to convince persons to provide her with information she needed for her frauds, and made them feel that they could not reveal that without committing a crime. Defendant's possession of illegal and untraceable weapons and a silencer is all the more chilling because defendant demonstrated that she would stop at nothing to complete her criminal plans when she personally dismembered Charles Wilding, crushing his teeth and bones to make it harder to identify his remains; defendant does not shrink from violent and gruesome tasks the way her co-conspirators did.

### F.   DEFENDANT'S HISTORY OF DRUG ABUSE WARRANTS DRUG TREATMENT AND TESTING, NOT LENIENCY

It is clear that defendant has had a long-term drug problem, especially with methamphetamine.  (PSR ¶¶ 137-141.)  Indeed, methamphetamine use is highly associated with the illnesses defendant says she suffers from.  Compare, https://www.mayoclinic.org/drugs-supplements/methamphetamine-oral-route/precautions/drg-20071824#:~:text=This%20medicine%20may%20cause%20Raynaud's,especially%20when%20exposed%20to%20cold and https://www.sciencedirect.com/topics/nursing-and-health-professions/limited-scleroderma, with PSR ¶¶ 132-133.  "Chronic methamphetamine abuse has devastating effects on the central nervous system. . . . The mainstay of treatment for the problems associated with chronic methamphetamine abuse is abstinence." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3148451/

27

It is to be hoped that defendant's forced abstinence from illicit drugs while in prison will help her body to heal.  Because "[s]ubstance abuse is highly correlated to an increased propensity to commit crime," drug "dependence or abuse ordinarily is not a reason for a downward departure."  USSG § 5H1.4.  Instead, the guidelines properly emphasize substance abuse treatment:  "[I]t is highly recommended that a [substance abusing] defendant who is incarcerated also be sentenced to supervised release with a requirement that the defendant participate in an appropriate substance abuse program."  Id.  The government hopes that defendant will take advantage of the myriad drug treatment programs available in prison, including especially the Residential Drug Abuse Program ("RDAP"), for which she appears eligible, and which can reduce the amount of time she actually spends in prison, as described below.

### G.   A NOMINAL SENTENCE OF 240 MONTHS IN THIS CASE MAY MEAN LESS THAN ELEVEN YEARS ACTUALLY IN PRISON

There are now so many ways for a defendant to reduce the time she actually serves in prison that it is difficult for a sentencing court to understand how a nominal sentence will translate into months in prison.  To make a concrete example, let us assume that the Court imposes a nominal sentence on defendant of 240 months.  First, provided defendant does not misbehave, she would reduce her sentence by 54 days per year for good time credit, or almost three years (1,080 days) total in this example.  18 U.S.C. 3624(b)(1) ("a prisoner . . . may receive credit toward the service of the prisoner's sentence of up to 54 days for each year of the prisoner's sentence imposed by the court").  Second, if defendant completed RDAP, she could reduce her sentence by up to another 12 months.  18

U.S.C. § 3621(e)(2)(B) (the RDAP "reduction may not be more than one year from the term the prisoner must otherwise serve").  Finally, under the First Step Act, defendant could earn up to 15 days of "earned time credit" for each 30 days in prison.  18 U.S.C. § 3632(d)(4)(i) & (ii) (prisoners "shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities," and those with the low recidivism scores "shall earn an additional 5 days of time credits for every 30 days," or 15 days of earned time credit per 30 days of prison).  Up to one year of this earned time credit can be applied toward early placement on supervised release. 18 U.S.C. § 3624(g)(3) ("the Bureau of Prisons may transfer the prisoner to begin [a] term of supervised release at an earlier date, not to exceed 12 months, based on the application of [earned] time credits").  Further, a defendant can be "prereleased" from prison to a halfway house or home confinement as soon as her remaining "earned time credits" equal her remaining sentence.  18 U.S.C. § 3624(g)(1)(A) (a prisoner is eligible for "prerelease custody" when she "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment").  In the example above, defendant's nominal sentence of 240 months is reduced by 36 for good time credit, and 12 for RDAP, reducing it to about 192 months.  After defendant serves about 128 months in prison, she could have enough "earned time credit" to be released to either a community confinement center or, because those are usually over full, home confinement.  Thus a nominal 240 month sentence in this case could translate into less than 11 years of actual prison time.

**III. CONCLUSION**

For the reasons stated above, the Court should sentence defendant to the statutory maximum, 240 months in prison, followed by three years of supervised release, as recommended by the Probation Office.

Dated: January 25, 2024          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 MACK E. JENKINS
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 /s/ Andrew Brown
                                 _____
                                 ANDREW BROWN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

### Declaration of Lyndon Versoza

I, LYNDON VERSOZA, do hereby declare and affirm:

1.   I have been a Postal Inspector since 2005.  LAPD Homicide asked me to join this investigation because I specialize in federal financial crimes and money laundering investigations.

2.   I have reviewed the accompanying brief, which contains many quotations from digital devices seized in this investigation. The quotations accurately reflect what was on the digital devices.

3.   I have attached several exhibits in this case, which are true and correct copies taken from discovery.

4.   I have attempted to trace the proceeds of the frauds in this case.  It is not possible to do so completely, however, because some of the money was withdrawn as cash.  Nevertheless, the person who received the most money is clearly Caroline Herrling.  Of the $3,887,051 conservative calculation of losses, I traced an approximate amount of about $2.069 million which was deposited or passed through accounts controlled by Caroline Herrling.  Some of this she gave to others, as described below.  But just from the Robert Tascon fraud she kept for herself over $400,000 of the proceeds to purchase real property held in her name.  The extant financial records show that the next most highly paid conspirator was Jason Kroth, who got at least $240,000.  Most of the other participants received far less.  Financial records show, for example, that Caroline Herrling paid the following co-conspirators the following amounts:

Hadley Pelletier: $67,000

Kenneth Salinas: $5,000

James Kantor: $64,000

1    Samuel Shtolzberg: $40,000

2    5.   On Caroline Herrling's phone, I saw screen captures of

3    Google satellite view of affluent areas, which had homes with algae-

4    filled swimming pools marked by pins.  This identified valuable real

5    estate that had fallen into disuse and may not have been occupied,

6    and therefore was vulnerable to a takeover of the kind she did with

7    Charles Wilding's property.

8    6.   From speaking with attorney Rodney Gould and reviewing

9    court documents, I learned that the heirs who would have inherited

10   the Charles Wilding estate included Lawrence Eckert, Pamela Sokol,

11   and Susan Smith.

12   7.   From speaking with attorney Neal Jannol and reviewing

13   court documents, I learned that the heirs who would have inherited

14   the Lowenstein estate included Christine Nealy.  While it is to be

15   hoped that she will recover the purchase price of Lowenstein home

16   that defendant arranged to be sold, she is nevertheless out of

17   pocket because the conspirators stole and sold the art work and

18   other collectibles from the estate.  From reviewing records, I have

19   learned that these collectibles from the estate were possibly worth

20   hundreds of thousands of dollars.

21   8.   I reviewed the forged Lowenstein will and saw that it

22   contained the identifying information of a real person, Jocelyn

23   Korchak, who was falsely listed as a purported witness on the forged

24   Lowenstein will.

25   ///

26

27

28

32

1    I declare under penalty of perjury that the foregoing is true
2  and correct to the best of my knowledge.
3    Dated: January 24, 2023
4                                    /s Lyndon Versoza
5                                    Inspector Lyndon Versoza