E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0102
     Facsimile: (213) 894-6269
     E-mail:    andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:23-CR-59-MEMF |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S SENTENCING POSITION; EXHIBITS |
| v. | |
| CAROLINE JOANNE HERRLING, aka "Carrie Phenix," | Sentencing: February 9, 2024  2:00 p.m. |
| Defendant. | |

On September 6, 2023, defendant emailed her objections to the Presentence Report to the Probation Office, but did not file them. On January 24 and 25, 2024, the government filed its sentencing positions, which addressed those emailed objections. (Dkt. 46 and 47.) On January 29, 2024, defendant filed her sentencing position, which largely restated her initial objections, but did include some new arguments. (Dkt. 51.) Below, the government responds to defendant's new arguments.

### A. THE PREPONDERANCE OF THE EVIDENCE STANDARD APPLIES AT SENTENCING

The Guidelines themselves state that sentencing enhancements are to be shown by the preponderance of the evidence standard. See USSG § 6A1.3, commentary (the "Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements"). The Supreme Court has never endorsed a higher standard of proof at sentencing. Cf., United States v. Watts, 519 U.S. 148, 156 (1997) ("application of the preponderance standard at sentencing" to find facts that inform the court's selection of a sentence within the prescribed statutory range "generally satisfies due process."); Alleyne v. United States, 570 U.S. 99, 116 (2013) ("[B]road sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."); United States v. Booker, 543 U.S. 220, 233 (2005) ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."); see also 18 U.S.C. 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Defendant argues, however, that the standard of proof for finding facts that support a sentencing enhancement should be clear and convincing:

> The defendant submits the proposed adjustments must be proved by the government by clear and convincing evidence since the adjustments lead to a substantial increase in offense levels. See United States v. Mezas De Jesus 217 F.3d 638, 643 N.8. (9th Cir. 2000).

(Dkt. 51, page 4.)  It is true that the Ninth Circuit has sometimes required clear and convincing proof of sentencing factors with an extremely disproportionate effect on a defendant's sentence.  But defendant has overlooked that those cases do <u>not</u> apply here, where the enhancements are based on the extent of a conspiracy, and the defendant has been convicted of conspiracy:

> Enhancements based on the extent of a conspiracy are on a fundamentally different plane than enhancements based on uncharged or acquitted conduct.  Due process concerns with regard to the former are satisfied by a preponderance of the evidence standard because the enhancements are based on criminal activity for which the defendant has already been convicted.

<u>United States v. Armstead</u>, 552 F.3d 769, 777 (9th Cir. 2008) (citations and quotations omitted).

The breadth of a conspiracy charge opens a defendant to a similarly broad range of sentencing enhancements.  <u>See</u> <u>United States v. Harrison-Philpot</u>, 978 F.2d 1520, 1523 (9th Cir. 1992) (sentencing factor which increased sentencing range from 41-51 months to 292-365 months may be proved by preponderance of evidence because defendant "was charged and convicted of conspiracy [and it was] the extent of the conspiracy [that] caused the tremendous increase in [defendant's] sentence.").

The Ninth Circuit has "repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need <u>not</u> be established by clear and convincing evidence."  <u>United States v. Treadwell</u>, 593 F.3d 990, 1001 (9th Cir. 2010) (emphasis added) (affirming the district court's use of the preponderance standard at sentencing when applying a 22-level enhancement for losses exceeding $44 million in a conspiracy to commit wire fraud case).  Accord, <u>United States v. Berger</u>, 587 F.3d 1038, 1048 (9th Cir. 2009) ("our

cases . . . . involv[ing] a defendant's fraudulent conduct where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy. . . . hold that facts underlying the disputed enhancements need only be found by a preponderance of the evidence.").

In any event, the enhancements found by the Probation Office were generally based on written communications between defendant and her co-conspirators, or recorded calls between them, and so would easily meet the clear and convincing standard, assuming for the sake of argument that it were to be applied.

Finally, now that <u>Booker</u> has given district courts the freedom to vary from the sentencing guideline range, the standard of proof for sentencing enhancements is far less important.  Even if the Court were to determine that the clear and convincing standard applied, and that a particular enhancement did not meet that standard, nothing would prevent the Court from considering that conduct as an aggravating factor under 3553(a), where the clear and convincing standard does not apply.

    **B.    DEFENDANT'S CONFLICT WITH ANOTHER PRISONER IS IRRELEVANT FOR SENTENCING**

Defendant asserts in her brief that her sentence should be reduced because she was "physically and sexually assaulted" by another female inmate while detained on this case.  (Dkt. 51, page 11, item 6.)  But defendant's own self-serving emails, written with an eye towards litigation, rebut that claim.  Instead, they show that defendant claimed another inmate had subjected her to lewd and unwanted sexual *comments* only.  (Dkt. 51-1, exh. D, pages 12-16.) Defendant's complaints were sometimes petty, including that her

4

antagonist received "special treatment, including extra time out of her cell []more than myself." (Dkt. 51-1, exh. D, page 12.) Defendant also contended that she was "shocked by MDC's lack of sensitivity, understanding, and care" regarding her claim of harassment. Id. at 13. According to MDC's investigation of the matter, defendant's antagonist asserted that defendant and her friends had made up the complaint in order to get the antagonist moved, which in fact worked. The antagonist's story is made more credible by defendant's blatantly seeking such a transfer after learning that the Prison Rape Eliminate Act (PREA) mandated it: "It was my understanding that, once a PREA report has been made against an Inmate, the offending party is to be permanently and immediately removed from the presence of the Victim." (Dkt. 51-1, exh. D, page 13.) There is no need for the Court to attempt to resolve this she-said-she-said situation. Even if defendant had been subjected to unwanted lewd comments, and the MDC staff had been slow to remove the offending inmate from defendant's presence, that has no bearing on the appropriate punishment for defendant, or the need to protect the public from defendant's criminality.

### C. DEFENDANT'S SCHEME KILLED ROBERT TASCON, AND ENDED THE LOVE HE SHARED WITH MIRACLE WILLIAMS

While fraud is ordinarily thought of as a purely economic crime, it can also be emotionally devastating, as victims learn to mistrust other persons generally. Suicide remains a rare response. Only two of Bernie Madoff's thousands of victims actually committed suicide. https://www.nytimes.com/2021/04/14/nyregion/bernie-madoff-victims.html. But thoughts of suicide are not rare, particularly among victims of identity theft, who will see their credit destroyed

5

and are often involved in lawsuits as creditors dun them for charges actually incurred by others:

> A new study reveals a growing number of identity theft victims are having thoughts of suicide after these difficult and often heartbreaking experiences. The Identity Theft Resource Center found 16% of identity crime victims who contacted ITRC in the past year said they've considered suicide.

https://www.koaa.com/money/consumer/study-reveals-increasing-number-of-id-theft-victims-are-experiencing-suicidal-thoughts.

Unfortunately, defendant's victim Robert Tascon was unusually vulnerable, as he had struggled with mental health issues even before defendant stole his house and only asset by identity theft. He had moved from California to Texas to be with the love of his life, Miracle Williams, and hoped to leave his troubled past behind. He planned to sell the home his parents had left him in Encino to use the proceeds to start over with Ms. Williams in Texas, far from the L.A. drug culture that had bedeviled him.

But thanks to defendant and her co-conspirators, Mr. Tascon's plan went awry. Far from having a nest egg to start over, he was forced to use his last money to finance a lawsuit in a vain effort to get back the house that defendant stole from him. This left him "defeated and distraught." (Exh. page 2.) He felt "helpless" and that he would never be free of the trouble he had had in California. He worried about what the criminals who had his identifying information would do next. The stress started to affect him physically. Sometimes he would sit like in a trance, ignoring everyone else in the room. He hated his situation, the stress of the theft of his house and the lawsuit. (Id.) When Robert Tascon

6

and Miracle Williams were briefly apart due to a birthday party, Mr. Tascon committed suicide.  (PSR 47.)

> When Miracle came home, their garage was covered with blood.  She asked for a crime-scene cleaner to come, but no one did.  Miracle got a hose, push broom and scrub brush and washed away "my baby's blood and pieces of his brain" for three to four hours, "crying and praying." Miracle did not have enough money for funeral arrangements, "so I cremated my baby, and put his ashes into a necklace."  Afterwards, Miracle was so distraught that she overdosed on sleeping pills and was taken to the hospital, and then an in-patient mental health hospital. Miracle has not recovered.  She is constantly reminded of Robert by places they went, and friends they knew, or even people who resemble Robert.  Now, "I stay in the house, I have trouble going into a store by myself."  "I stay on the phone with my mother most of the day because my anxiety is so bad."  Miracle would like therapy but cannot afford it.  She finds solace at church and wants to read the Bible.  On the one-year anniversary of Robert's death, Miracle got his favorite-colored balloons, and released them to heaven with a note to Robert.

(Exh. page 3.)

### D. DEFENDANT DOES NOT QUALIFY FOR THE ZERO CRIMINAL HISTORY POINTS TWO-LEVEL REDUCTION

In defendant's proposed sentencing calculations, she includes a two-level reduction for certain defendants that have zero criminal history points (dkt. 51, page 8), even though the Probation Office found it inapplicable.  Defendant is ineligible for the Section 4C1.1 zero criminal history points reduction for five separate reasons, any one of which alone would preclude that adjustment. First, defendant does have one criminal history point for having been convicted of "trespass: injure property" in 2011, for which she was sentenced to 18 months of probation.  (PSR ¶¶ 105-106; USSG § 4C1.1(a)(1).)  Second, the offense resulted in the death of Robert Tascon.  (PSR ¶ 47; USSG § 4C1.1(a)(4).)  Third, defendant personally caused substantial financial hardship to both Robert Tascon and his common-law wife, Miracle Williams.  (Dkt. 47, pages

10-11, 26, and 46-47:  defendant stole Robert Tascon's only house, which Miracle Williams should have inherited on Mr. Tascon's death; USSG § 4C1.1(a)(6).)  Fourth, defendant possessed many firearms, which appear to have been connected to her offense.[1]  (PSR ¶¶ 52, 101; USSG § 4C1.1(a)(7).)  Fifth, defendant was a leader of the criminal activity.  (PSR ¶¶ 81-86; USSG § 4C1.1(a)(10).)

Dated: February 1, 2024         Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

*Andrew Brown*

_____
ANDREW BROWN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[1] That defendant's firearms were in many cases loaded and "ghost guns" without serial numbers indicates that defendant kept them for nefarious purposes, as does her possession of a silencer made from an oil can.  Given defendant's many frauds and her use of other criminals as subordinates, it is not surprising that she would arm herself, particularly because she sometimes unilaterally cut the share of the proceeds allocated to others when she felt they had not performed all the tasks she had assigned them.